**TEAMSTERS LOCAL 617 PENSION AND WELFARE FUNDS, on behalf of itself and all other similarly situated, Plaintiff,**

v.

**APOLLO GROUP, INC.; John G. Sperling; Todd S. Nelson; Kenda B. Gonzales; Daniel E. Bachus; John Blair; John R. Norton III; Hedy Govenar; Brian E. Mueller; Dino J. DeConcini; Peter Sperling; and Laura Palmer Noone, Defendants.**

**No. 2:06–CV–2674–PHX–RCB.**

United States District Court,
D. Arizona.

March 31, 2009.

Jay P. Saltzman, Schoengold Sporn Laitman & Lometti PC, New York, NY, Michael Salcido, James W. Barnhouse, Buckley King LPA, Robert O. Dyer, Polsinelli Shughart PC, Robert D Mitchell, Joshua Ray Forest, Susan Joan Martin, Martin & Bonnett PLLC, Phoenix, AZ, Patrick V. Dahlstrom, Pomerantz Haudek Block Grossman & Gross LLP, Chicago, IL, Ramzi Abadou, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Lauren S. Antonino, Motley Rice LLC, Atlanta, GA, Samuel H. Rudman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, for Plaintiffs.

Brian A. Herman, Morgan Lewis & Bockius LLP, New York, NY, Joseph E. Floren, Morgan Lewis & Bockius LLP, San Francisco, CA, Michael J. Farrell, Steven Charles Lawrence, Jennings Strouss & Salmon PLC, Phoenix, AZ, Peter B. Morrison, Virginia F. Milstead, Eric S. Waxman, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, CA, for Defendants.

## ORDER

ROBERT C. BROOMFIELD, District Judge.

### Introduction

Since the publication of a series of *Wall Street Journal* articles in March 2006, "reporting academic research suggesting that various companies were suspiciously lucky in selecting their option grant dates[,]" *In re MIPS Technologies, Inc.*, 2008 WL 3823726, at *2 (N.D.Cal. Aug.13, 2008), countless lawsuits have been filed across the country alleging backdating of stock options. This is one such lawsuit.

Lead plaintiff, Pension Trust Fund for Operating Engineers ("plaintiff"), "a $3.17 billion pension fund[,]" First Amended Complaint ("FAC") (doc. 71) at ¶ 16, brings this lawsuit against Apollo Group, Inc. ("Apollo"), "the largest accredited post secondary education institution in the United States[.]" Farrell Decl'n (doc. 80), exh. 2 thereto at 9. Also named as defendants are various individuals who were Apollo officers and directors between November 28, 2001, and October 18, 2006 ("the Class Period").

### Background

#### I. Overview of Claims

Basically, plaintiff alleges that defendants "intentionally manipulated stock option grants to [Apollo's] officers, directors and employees ... to provide the[m] ... with a more profitable exercise price and to under-report [Apollo's] expenses and thereby overstate [Apollo's] earnings." FAC (doc. 71) at ¶ 2. That allegedly fraudulent backdating occurred in three ways. First, defendants "violate[d] the terms of [Apollo's] stock option plan[.]" *Id.* at ¶ 5(a). Second, they "misrepresent[ed] how the options [we]re priced[.]" *Id.* at ¶ 5(b). Third, defendants "fail[ed] to properly record expenses associated with these option grants under GAAP [Generally Accepted Accounting Principles]." *Id.* at ¶ 5(c).

As a result of this alleged backdating "scheme, Apollo [was] forced to restate its previously filed financial statements for fiscal years 2001 through the second quarter of 2006 by over $59 million[.]" *Id.* at

¶ 2. That "scheme" likewise purportedly "caused" Apollo to issue "materially false and misleading" financial statements during the Class Period, "resulting in an artificial inflation of [Apollo's] stock price, the disclosure of which caused investors to lose hundreds of millions of dollars." *Id.* Through this "scheme," defendants also supposedly "concealed that Apollo was not recording material compensation expenses and was materially overstating its net income and earnings per share, in violation of … [GAAP]." *Id.* During the Class Period plaintiff purchased Apollo stock which, in light of the foregoing, it alleges was purchased at artificially inflated prices.

Plaintiff alleges violations of §§ 10(b) and Rule 10b–5, 20(A) (a), and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("the PSLRA"), against all defendants. It further alleges that all defendants violated a host of fiduciary duties under Arizona state common law "and/or aided and abetted" in the violation of those duties. *Id.* at 94. Lastly, plaintiff alleges that defendants Nelson, Blair, Norton, Gonzales, Bachus and Mueller engaged in a "civil conspiracy to commit fraud[.]" *Id.* at 95.

Currently pending before the court is Apollo's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (doc. 81), and the individual defendants'[1] motions to dismiss on that same basis (doc. 82). Additionally, Apollo and the individual defendants have each filed a "Request for Judicial Notice" ("RJN") (docs. 79 and 83), which plaintiff does not oppose.[2]

1. Apollo and the individual defendants will be referred to collectively throughout as "the defendants," unless necessary to distinguish among them.

2. Given the parties' comprehensive memoranda of law, including supplemental memoran-

## II. Overview of Allegations

As the court in *In re New Century*, 588 F.Supp.2d 1206 (C.D.Cal.2008), astutely observed, "in the securities class action context, the stringent pleading requirements appear to invite both parties to throw everything and the kitchen sink into their respective pleadings and motions to dismiss." *Id.* at *9. This case is no different. In an effort to separate the wheat from the chaff, at the outset the court will summarize plaintiff's allegations. It will then go on to consider each of defendants' numerous dismissal arguments.

The following facts, which the court must "accept[ ] as true" on these motions to dismiss, are derived from the FAC. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir.2008) (citation omitted). Additionally, as explained below, these facts are also derived from various documents which the FAC either incorporates by reference or of which the court may properly take judicial notice. From these documents, the following general picture emerges of Apollo's stock option grant process during the Class Period. More details will be provided herein as necessary to resolve these motions to dismiss.

Defendants vigorously deny that they engaged in fraudulent backdating of stock options. Rather, as Apollo depicts it, the Company merely "failed … to dot all 'i's and cross all 't's when completing the paperwork necessary to grant stock options." Mot. (doc. 81) at 7. The individual defendants similarly maintain that at most "innocent accounting errors[ ]" were made. Mot. (doc. 82) at 13. Given these widely

da ordered by the court, and other submissions, the court denies the parties' respective requests for oral argument, finding that it will not aid the court in its decisional process. *See Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir.1999).

divergent views of Apollo's stock option grant practices, before turning to the specific allegations in the FAC, an overview of stock option grants in general is warranted.

### A. The Rudiments of Stock Option Backdating

*In re CNET Networks, Inc.*, 483 F.Supp.2d 947 (N.D.Cal.2007), provides a succinct description of "the mechanics of stock-options backdating[,]" from which this court will heavily borrow. *See id.* at 949. When a company grants a stock option to an employee, that employee has "the right to purchase the stock at the exercise price at a later date after the option vests." *Id.* at 949. The "exercise price" is simply a pre-determined or designated price at which the underlying security may be purchased. *See* FAC (doc. 71) at 1, ¶ 3. Due to that later vesting date, "[i]f the stock price rises, the employee stands to make a profit." CNET Networks, 483 F.Supp.2d at 949. Conversely, "[i]f the stock price falls below the exercise price, the option is worthless to the employee." *Id.*

So-called "at-the-money" options are those "where the exercise price is at the market price as of the date of the grant[.]" *Id.* On the other hand, "in-the-money" options, which the FAC alleges were the type granted here, are those "where the exercise price is lower than the market prices as of the grant date[.]" *Id.* The distinction between these two types of options is significant for financial reporting purposes. Companies must "record compensation costs for granting in-the-money options because the company effectively receives a lower price than it could get for the shares on the open market[.]" *Id.* Not recording such options, as the FAC alleges, results in overstating a company's net income. *See* FAC (doc. 71) at 4, ¶ 8. On the other hand, there is no need to record compensation costs "for at-the-money options because

the exercise price is the same as the market price." *CNET Networks*, 483 F.Supp.2d at 949. Consequently, "[t]he company is not foregoing any revenue." *Id.* "Backdating occurs when the option's grant date is altered to an earlier date with a lower, more favorable price to the recipient." *Id.* at 950. This "[b]ackdating is done to avoid compensation expenses." *Id.* at 956.

### B. Apollo Stock Option Grants

Like many publicly held companies, as part of its compensation plan, Apollo granted stock options to its executives and employees. Plaintiff alleges that Apollo engaged in impermissible stock option backdating under two separate compensation plans whereby it awarded "Management Grants"—the Long Term Incentive Plan ("LTIP") and the 2000 Stock Incentive Plan. *See* FAC (doc. 71) at ¶ 41. Under the LTIP, between June 1994 to March 24, 2000, "Apollo issued stock option grants to Section 16 officers[.]" *Id.* at ¶ 42. The LTIP expressly required that the exercise price of "Incentive Stock Option[s]" [ ("ISO) ]" thereunder could "not be less than the Fair Market Value of a share of [s]tock on the date of [the] grant[.]" *Id.* at ¶ 42 (internal quotation marks and citation omitted). That limitation on the exercise price pertained only to ISOs, however. As to other stock options, the LTIP allowed the Compensation Committee to determine the exercise price, with no mention of fair market value. *Id.*, exh. B thereto at ¶ 7.1(a). The LTIP also required that both members of that Committee, defendants Norton and Blair, approve all grants made thereunder. *Id.* at ¶¶ 42; 22 and 23.

"After March 24, 2000, . . . Management Grants" were awarded pursuant to the 2000 Plan. *Id.* at ¶ 43. That Plan required grant approval by the two member Com-

pensation Committee, *i.e.* defendants Blair and Norton, "or by both the President and CEO[,]" which during the relevant time frame was the same person, defendant Nelson. *Id.* The FAC further alleges that "both Nelson and the Compensation Committee" approved backdated grants "during the relevant period." *Id.* (emphasis added). Defendant Nelson had the "authority to approve" option grants under the 2000 Plan for not only other employees, but also for himself. *Id.*

The 2000 Plan differed somewhat from the LTIP in terms of the exercise price. Like the LTIP, the exercise price for any ISO could "not be less than the Fair market Value as of the date of the grant." *Id.*, exh. C thereto at ¶ 7.2(a). As for certain other options, however, the Compensation Committee could grant options "with an exercise price of less than Fair Market Value on the date of grant." *Id.*, exh. C thereto at ¶ 7.1(a).

Quoting directly from the Restatement, the FAC alleges that the process of granting stock options at Apollo "followed a similar pattern each year[,]" with the initial development of a "list of grantees." *Id.* at 63, ¶ 106. In the ensuing weeks, adjustments would be made as to names, shares and "underlying vesting goals . . . developed." *Id.* at 64, ¶ 106. At times during this process there was insufficient documentation as to when, for example, certain grants were actually finalized. *See generally id.* at 63–67, ¶ 106. As defendants characterize it, these "documentation errors led Apollo to recognize additional compensation expenses of $52.9 million before tax for the years 1994 to 2005." Mot. (Doc. 82) at 9 (citing FAC at 63).

Despite defendants' depiction of the grant process at Apollo, plaintiff alleges that on June 28, 2006, "the truth beg[a]n to emerge" regarding Apollo's alleged backdating scheme. FAC (doc. 71) at 56, VII. On that date, a Lehman Brothers analyst "published a report titled, 'Did Apollo Backdate Options?'[.]" *Id.* at ¶ 89. Based upon an indication in that Report that *"Apollo['s] . . . option grant history looks highly questionable* [,]" the FAC alleges, "Apollo's stock price fell 2.7%" from the preceding day. *Id.* at ¶ 89 (internal quotation marks omitted) (emphasis added in FAC).

Apollo responded by issuing a news release stating, among other things, that after an internal review of its stock option practices "Management believes that it has complied with all applicable laws, . . . in granting options to officers and it has not backdated options." Farrell Decl'n (doc. 80), exh. 3 thereto at 3; *see also* FAC (doc. 71) at ¶ 91. Apollo further signaled its intent "to hire an outside firm to review and confirm [Apollo's] conclusions." *Id.*

Several weeks later, on June 19, 2006, Apollo "disclosed that it had received a subpoena from the U.S. Attorney for the Southern District of New York requesting documents relating to [its] stock option grants." FAC (doc. 71) at 58, ¶ 92. Shortly thereafter, on June 28, 2006, defendant John Sperling, at the time Apollo's Acting Executive Chairman, and defendant Peter Sperling, Apollo's Senior Vice President, "appointed a[S]pecial [C]ommittee . . . of the Board to oversee a review of" Apollo's stock option grant practices. *Id.* at ¶ 93. Defendant Hedy Govenar was one of two Apollo Board members appointed to that Special Committee. *Id.* The Special Committee "retain[ed] independent legal counsel, who in turn, retained forensic accountants, to assist them in conducting an independent review of [Apollo's] historical practices related to stock option grants[.]" Morrison Decl'n (doc. 83), exh. 1 thereto at 5. Soon after the formation of the Special Committee, Apollo "received a letter from the SEC [Securities Exchange Commission] announcing an informal in-

vestigation and requesting documents." FAC (doc. 71) at ¶ 94 (footnote omitted).

Due to that "ongoing investigation[,]" on July 13, 2006, "Apollo announced that . . . it was unable to timely file with the SEC its [fourth quarter] Form 10–Q[.]" *Id.* at ¶ 95 (internal quotation marks omitted). Plaintiff alleges that Apollo's stock dropped "23.5% from a close of $55.47 on June 8, 2006, to a close of $43.51 on August 8, 2006, in significant part due to the[se] disclosures of backdating." *Id.* at ¶ 96.

On October 18, 2006, Apollo "issued a news release and disappointing earnings announcement[.]" *Id.* at ¶ 98. The alleged import of those statements is that "for the first time, and in contrast to Apollo's previous denials, . . . *'various deficiencies in the process of granting and documenting stock options have been identified to date.* The accounting impact of these matters has not been quantified. *There can be no assurances that the results of the investigation will not require a possible restatement of the Company's financial statements* when the potential errors are quantified and assessed.' " *Id.* (emphasis added in FAC). Following that announcement, Apollo's stock price fell "22.0% in one day to a 4–year low of $37.55[.]" *Id.*

### C. Special Committee Results

On November 3, 2006, Apollo "announced the [Special Committee's] interim factual findings[.]" *Id.* at ¶ 99. Those findings "identified various deficiencies" in terms of "the process of granting and documenting stock options." *Id.* Among those deficiencies were Apollo's failure to "correctly apply the requirements of Accounting Principles Board . . . Opinion No. 25 [ ('APB 25') ] [;]" its misapplication of the Internal Revenue Service ("IRS") Code "with respect to the contemporaneous tax treatment of certain stock options[;]" and "inaccurate documentation concerning the date that grant award lists were completed and approved." *Id.* Despite those deficiencies, at that juncture the Special Committee "found no direct evidence that the grant date for any of the large management grants was selected with the benefit of hindsight." Morrison Decl'n (doc. 83), exh. 3 thereto at 3. Acknowledging the "possibility" in "two instances" that "the grant date was retroactively selected," nonetheless, Apollo stated that there was "insufficient evidence at th[at] time to reach such a conclusion." *Id.* On that same date, Apollo announced that its Chief Financial Officer and Treasurer, defendant Gonzales, had resigned two days earlier, on November 1, 2006. FAC (doc. 71) at ¶ 99. Following the Special Committee's announcement, the FAC alleges that "Apollo's stock price dropped another 2.72%[.]" FAC (doc. 71) at ¶ 100.

A few days later, on November 9, 2006, Apollo announced another resignation—the November 5, 2006 resignation of defendant Bachus, Apollo's Chief Accounting Officer and Controller. *Id.* at ¶ 102. Allegedly, "Bachus resigned as a result of his involvement in the backdating at Apollo[.]" *Id.* (citation omitted). During this roughly one week period in early November 2006, plaintiff claims that Apollo's "stock price declined 6.2%"—a decline which it specifically alleges was "not due to market or industry-specific events." *Id.* at ¶ 103.

On December 8, 2006, the Special Committee "presented their final factual findings" to Apollo's Board, findings which "were largely consistent" with the interim findings outlined above. Morrison Decl'n (doc. 83), exh. 4 thereto at 3. Additionally, the Special Committee "reported . . . that certain former officers took steps that may have been intended to mask failures in the grant approval process with respect to [Apollo's] financial reporting and payment of taxes." *Id.* The Special Committee fur-

ther advised the Board that it had "recently discovered additional evidence that raise[d] questions whether another grant date" besides the two mentioned earlier, "may have been retroactively selected by a day[,]" but the Committee stated that there was "insufficient evidence to reach such a conclusion." *Id.* Nonetheless, at that time Apollo determined that it had "understated its allowance for doubtful accounts" and had an "associated bad debt expense of approximately $34 million." *Id.*, exh. 4 thereto at 4. The next trading day, after this information was filed with the SEC, the FAC alleges that Apollo's stock price "declined by 3.59%[.]" FAC (doc. 71) at ¶ 105.

### D. Restatement

Roughly six months after the Special Committee released its final findings, on May 22, 2007, Apollo filed with the SEC "its belated Form 10–K containing restated financial results [ ('the Restatement') ]. *Id.* at ¶ 106. The FAC contains large block quotes from the Restatement making it difficult to ascertain exactly what parts thereof plaintiff deems pertinent to its claims. Suffice it to say for now that the Restatement indicates that Apollo 'used incorrect measurement dates for accounting purposes[ ]' for 57 of the 100 total grants made during this time period[,]" *Id.* at 62, ¶ 106. "As a result, revised measurement dates were selected for many grants and resulted in exercise prices that were less than the fair market value of the stock on the most likely measurement dates[,]" and Apollo "restated [its] financial result[s] to record additional share based compensation expense." *Id.* at 63, ¶ 106; and at 69, ¶ 106. Overall, the "Impact of the Restatement[,]" was that Apollo's "retained earnings as of September 1, 2003," were "adjusted" downward from $765.2 million to $702.7 million. Morrison Decl'n (doc. 83), exh. 1 thereto at 15.

On July 3, 2007, Apollo announced that the SEC had "completed its investigation and ... [it] d[id] not intend to recommend any enforcement action[.]" Farrell Decl'n (doc. 802), exh. 1 thereto at 2; *see also* FAC (doc. 71) at ¶ 94 n. 4. Several months after the filing of the Restatement, but prior to the completion of that SEC investigation, on November 2, 2006, this action was commenced. Approximately one year later, following the appointment of lead plaintiff and lead counsel, on November 23, 2007, the complaint which is the subject of these dismissal motions was filed.

. . .

### Discussion

### I. Scope of Documents Considered

#### A. Defendants' Requests

Preliminarily, the court will address defendants' requests for consideration of documents beyond the complaint. The court will proceed in this way because "as a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion." *U.S. v. 14.02 Acres of Land More or Less,* 530 F.3d 883, 894 (9th Cir. 2008) (internal quotation marks and citation omitted). "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *U.S. v. Ritchie,* 342 F.3d 903, 907 (9th Cir.2003) (citations omitted). There are two exceptions to these general rules. The first is the incorporation by reference doctrine; and the second is the doctrine of judicial notice. Under either of those doctrines, a court may consider certain matters beyond the complaint, without converting a motion to dismiss into a summary judgment mo-

tion. *See id.* at 908 (citations omitted). Here, the defendants are relying upon both doctrines, which the court will address in turn.

### 1. *Incorporation by Reference*

It is well settled that, "a court may consider material which is properly submitted as part of the complaint on a motion to dismiss without converting th[at] motion ... into a motion for summary judgment." *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001) (internal quotation marks and citation omitted); *see also* Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.") The incorporation by reference doctrine allows a court to also "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir.2005) (internal quotation marks and citations omitted). Taking a relatively expansive view of that doctrine, the Ninth Circuit has recognized that "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie,* 342 F.3d at 908 (citations omitted). Under those circumstances, "the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006) (internal quotation marks and citation omitted).

Significantly, in *In re Silicon Graphics Secs. Litig.,* 183 F.3d 970 (9th Cir.1999), the Ninth Circuit held that on a motion to dismiss the district court properly invoked the incorporation by reference doctrine to consider a company's SEC filings where the plaintiff alleged the contents of those filings in her complaint and relied on them as a basis for her allegations. *Id.* at 986; *see also Fecht v. Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995) (affirming district court's consideration on motion to dismiss of "full text of the Company's corporate disclosure documents and ... securities analysts' reports quoted in the Complaint[ ]").

In this action, the FAC is 103 pages, with attached exhibits totaling 79 pages. It references 11 of the 13 documents which Apollo requests the court to consider, and 8 of the 12 documents which the individual defendants request the court to consider. Defendants' requests overlap somewhat.

Given that plaintiff is not opposing these defense requests, obviously, there are no authenticity challenges. Thus, under the incorporation by reference doctrine, the court will consider the following documents, as necessary, to resolve these motions to dismiss:

(1) the July 3, 2007, news release entitled "Apollo Group, Inc. Announces Completion of SEC Investigation[;]"

(2) a June 8, 2006, Lehman Brothers Equity Research Company Update ("the Lehman Report");

(3) Apollo's Form 8–Ks filed with the SEC on October 18, 2006; November 6, 2006; and December 15, 2006;

(4) excerpts from Apollo's Form 8–Ks filed with the SEC on June 12, 2006, and June 20, 2006;

(5) excerpts from Apollo's Form 10–K filed with the SEC on May 22, 2007;

(6) a Yahoo! Finance print out, documenting the market price of Apollo's common stock from December 1998, April 1999, and May 14, 2007 until present;

(7) excerpts from the November 17, 2006, deposition transcript of John Sper-

ling in *In re Apollo Group, Inc. Securities Litigation*, CV 04–2147–PHX–JAT; (8) a September 19, 2006, letter from the SEC's Chief Accountant; and

(9) Apollo "stock trading price information for the periods January 1, 1998 through December 31, 2001 and January 1, 2006 through December 31, 2007 downloaded from *Google Finance ...* [.]"

RJN (doc. 79) at ¶¶ 1–10; and RJN (doc. 83).

. . .

### 2. Judicial Notice

■ Pursuant to Fed.R.Evid. 201, a court may "take judicial notice of matters of public record and consider them without converting a Rule 12 motion into one for summary judgment." *14.02 Acres of Land*, 530 F.3d at 894 (internal quotation marks and citation omitted). That Rule "governs only judicial notice of adjudicative facts." Fed.R.Evid. 201(a). The notes following that Rule define "adjudicative facts" as "simply the facts of the particular case." Fed.R.Evid. 201 advisory committee's note. The court may take judicial notice of such facts "as long as the facts noticed are not subject to reasonable dispute." *Intri–Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (internal quotation marks and citation omitted). Rule 201 therefore provides an alternative means by which the court can consider Apollo's SEC filings, reported stock price history, and the other publicly available financial documents listed above. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064, n. 7 (9th Cir.2008) (citation omitted) ("proper" for district court to take judicial notice of "reported stock price history and other publicly available financial documents, including ... SEC filings[ ]" on motion to dismiss).

■ The complaint does not reference the remaining four documents of which the individual defendants request the court to take judicial notice. Three of those documents also are SEC filings: (1) Apollo's Form 8–Ks filed on March 15, 2007, and on May 4, 2007; (2) Apollo's Articles of Incorporation, filed on August 1, 2000; and (3) the Articles of Amendment thereto, filed in Apollo's Form 8–K filed on July 27, 2007. As just explained, the court may properly take judicial notice of these various SEC filings. That is because such filings "are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.' " *In re White Electronic Designs Corp. Secs. Litig.*, 416 F.Supp.2d 754, 760 (D.Ariz.2006) (quoting *In re Network Assoc., Inc. II Secs. Litig.*, 2003 WL 24051280, at *1 n. 3 (N.D.Cal. Mar.25, 2003)) (other citations omitted). The court stresses that it only is taking judicial notice of "the content" of these various SEC filings, "and the fact that they were filed with the agency." *See Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D.Cal.2008). "The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201." *Id.* (citations omitted). Accordingly, as in *Patel*, the court will take judicial notice of these SEC filings, but only to the extent the individual defendants are seeking judicial notice of the content of those documents and the fact of their filing. *See id.*

The last document of which the individual defendants seek to have this court take judicial notice is a December 4, 2006, court order in *Alaska Electrical Pension Fund, Derivatively on Behalf of Apollo Group, Inc. v. Sperling*, CV–06–2124–PHX–ROS. Curiously, despite this explicit request, these defendants do not mention that order either in their motion or in their reply. Nor does their RJN offer any insight as to why judicial notice of that order is neces-

sary. The individual defendants merely state that the court may take judicial notice of the *Alaska Electrical* order "because it is an order of another court." RJN (doc. 83) at 4 (citing *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992)). The court declines to speculate as to the supposed import of the *Alaska Electrical* order on this action. Accordingly, it denies the individual defendants' request to take judicial notice of that order. *See White Electronic,* 416 F.Supp.2d at 761 (refusing to take judicial notice where defendants did "not explain[ ] why they ... requested judicial notice").

Like the individual defendants, Apollo also is requesting that the court take judicial notice of documents which the FAC does not reference. The first is a news article. On the theory that it is a "matter of public record and not subject to dispute[,]" RJN (doc. 79) at ¶ 7, Apollo is seeking to have the court judicially notice "an October 18, 2006 news article entitled 'Apollo Group Says Fourth–Quarter Net Income Declines 12 Percent.' " Farrell Decl'n (doc. 80) at ¶ 8; and exh. 7 thereto. The second document is "[a] March 8, 2007 NERA Economic Consulting report entitled 'Options Backdating: The Statistics of Luck,' available at *http://www.nera.com/ image/PUB_Backdating_Part_III_Sep 2007–FINAL.pdf*[.]" *Id.* at 3; and exh. 12 thereto. As part of the "Background" for their motion, the individual defendants included a section entitled *"Stock Options and 'Backdating' A Primer[.]"* Apollo Mot. (doc. 81) at 4 and 15. (Emphasis omitted) Based generally upon that NERA report, Apollo notes in passing that "one might reasonably expect companies lawfully to grant options at times when their stock prices are relatively low, without any 'backdating.' " *Id.* at 6, n. 5 (citation omitted).

■ "It is appropriate for the court to take judicial notice of news articles regarding defendants' stock or corporate activities[,]" such as the October 18, 2006, news article identified above, and it will. *See Patel,* 253 F.R.D. at 549 (citations omitted). This is so even though the complaint does not mention this particular article. *See Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d at 981 and n. 18. The court will therefore take judicial notice of the October 18, 2006 news article. On the other hand, it will not take judicial notice of the NERA report because although Apollo is referenced generally in a table thereto, neither the report itself nor that table include adjudicative facts properly subject to judicial notice under Rule 201.

### B. Plaintiff's Exhibits

In opposing these motions, plaintiff also is relying upon documents not attached to the complaint. Those documents are exhibits to the declaration of attorney Wood who is associated with the law firm appointed as lead counsel. In contrast to the defendants, though, plaintiff did not specifically request that the court take judicial notice of any of those exhibits. Nonetheless, the court could, *sua sponte,* take judicial notice of those exhibits. *See* Fed. R.Evid. 201(c). For that reason, and because those exhibits are part of plaintiff's opposition, the court must decide whether to consider any of those exhibits on these Rule 12 motions.

### 1. CFRA Educational Report

■ In its factual recitation, plaintiff includes a relatively lengthy quote by an analyst at the Center for Financial Research and Analysis ("CFRA"). That quote is taken from an "Educational Report" entitled "Options Backdating— Which Companies are at Risk[:] A Survey of the Top 100 Users of Stock Options

1997–2002[.]" Wood Decl'n (doc. 95), exh. A thereto at 1. Plaintiff relies upon an excerpt from that report to summarize "the risks for companies found to have backdated stock options[.]" Resp. (doc. 94) at 15.

Pursuant to Fed.R.Evid. 201(c), the court in its discretion may *sua sponte* take judicial notice of an adjudicative fact. The court declines to do so with respect to this CFRA report however. The primary reason for not taking judicial notice is that, as Apollo accurately points out, "although th[at] report identifies 32 companies as having the highest risk of having backdated options, the report does not mention Apollo at all." Reply (doc. 97) at 15. Clearly then this CFRA report does not contain an adjudicative fact, *i.e.* "the facts of the particular case[,]" of which this court may properly take judicial notice. *See* Fed.R.Evid. 201 advisory committee's note. The court observes that while it is not refusing to take judicial notice on this basis, somewhat tellingly, every page of that report includes the qualifying language that it is "[f]or the exclusive use [of] Lerach Coughlin Stoia & Robbins, LLP." Wood Decl'n (doc. 95), exh. A thereto at 10–26. The inclusion of that qualifying language calls into question the objectivity of this CFRA report.

### 2. *"The Arizona Republic" Article*

Exhibit B to the Wood declaration is a January 17, 2008, article from "The Arizona Republic" entitled "Apollo Guilty of Securities Fraud[.]" Wood Decl'n (doc. 95), exh. B thereto at 1. If for no other reason, the court will not take judicial notice of this article because the jury verdict discussed therein was subsequently set aside by Judge Teilborg. *See In re Apollo Group, Inc. Sec. Litig.*, 2008 WL 3072731 (D.Ariz. Aug.4, 2008). Thus, even if this "Arizona Republic" article was relevant to the present case at some point, it no longer is.

### 3. *Verdict Form*

Likewise, the court also will not take judicial notice of, or otherwise consider exhibit C to the Wood declaration, the jury verdict form in the *Apollo Group* case— the same verdict which Judge Teilborg set aside.

### 4. *Apollo Stock Chart*

■ The fourth exhibit to the Wood declaration is an untitled one page document. Neither the source of that document nor its significance appear on the face thereof. Attorney Wood describes the columns of numbers contained thereon as an "Apollo stock chart showing the 50 dates when the highest volume of Apollo Group, Inc. Stock was traded from February 2, 1995 to March 20, 2008, retrieved from Yahoo! Finance (http;//finance.yahoo.com) and sorted by volume with Microsoft Excel." Wood Decl'n (doc. 95) at 2, ¶ 2. Plaintiff is relying upon that chart to show that "[m]ore shares of Apollo stock changed hands on October 18, 2006 than ever before in Apollo's history." Resp. (doc. 94) at 28.

Largely because the source of that chart is not apparent from its face, and because the method of its creation uncertain, the court will not take judicial notice of it. *See White Electronic*, 416 F.Supp.2d at 761 (refusing to take judicial notice, in securities fraud case, of exhibit "purport[ing] to be a chart showing [defendant's] stock prices" where "source not apparent from the document itself and not all of the share prices on th[e] chart compared with share prices for specific dates listed in the Complaint[ ]").

## II. *Motions to Dismiss*

### A. *Rule 12(b)(6) Standards*

It is axiomatic that Rule 12(b)(6) motions "test[ ] the legal sufficiency of the claims asserted in the complaint[.]" *Ileto*

*v. Glock, Inc.,* 349 F.3d 1191, 1199–1200 (9th Cir.2003). "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare System, LP,* 534 F.3d 1116, 1121–1122 (9th Cir.2008) (internal quotation marks and citation omitted). It is the latter theory of dismissal which forms the basis for defendants' attacks on the FAC in this case.

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *In re Gilead Sciences Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir.2008) (internal quotation marks and citation omitted), *petition for cert denied,* (—— U.S. ——, 129 S.Ct. 1993, 173 L.Ed.2d 1085 (2009)). At the same time though, the court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.' " *Id.* (internal quotation marks and citations omitted). As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . ., a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 127 S.Ct. 1964–1965 (internal quotation marks and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, . . ., on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* at 1965 (citations and footnote omitted). Similarly, "[l]egal conclusions need not be taken as true merely because they are cast in the form of factual allegations." *Lee Myles Associates Corp.*

*v. Paul Rubke Enterprises, Inc.,* 557 F.Supp.2d 1134, 1137 (S.D.Cal.2008) (citations omitted).

At the end of the day, "[t]he complaint is properly dismissed if it fails to plead enough facts to state a claim to relief that is plausible on its face." *Gilead,* 536 F.3d at 1055 (internal quotation marks and citations omitted). On the other hand, as the Supreme Court stressed in *Twombly,* "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965 (internal quotation marks and citation omitted). "Indeed, it may appear on the face of the pleading that recovery is very remote and unlikely but that is not the test." *Johnson,* 534 F.3d at 1123–24 (internal quotation marks and citations omitted).

### B. Statute of Limitations

Although not the first dismissal argument which Apollo raises, because it can potentially narrow the scope of plaintiff's claims, the court will address Apollo's statute of limitations argument first.

■ Preliminarily, there is no merit to plaintiff's suggestion that this statute of limitations argument is not properly before the court on this Rule 12 dismissal motion. "If the expiration of the applicable statute of limitations is apparent from the face of the complaint," it is well settled that "the defendant may raise [that] defense in a Rule 12(b)(6) motion to dismiss." *See In re Juniper Networks, Inc. Sec. Litig.,* 542 F.Supp.2d 1037, 1050 (N.D.Cal.2008) (citing *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980)). Despite plaintiff's contrary suggestion, "[t]his is true even though expiration of the limitations period is an affirmative defense because Federal Rule of Civil Procedure Rule 9(f) makes averments of time and place material for

the purpose of testing the sufficiency of a complaint." *Id.* (internal quotation marks and citation omitted). Consistent with the foregoing, "[i]f a claim is barred by [the] applicable statute of limitations, dismissal pursuant to Rule 12(b)(6) is appropriate." *Guerrero–Melchor v. Arulaid,* 2008 WL 539054, at *2 (W.D.Wash. Feb.22, 2008) (citation omitted).

■ At the same time, though, the court is keenly aware that a complaint cannot be dismissed as untimely under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Pesnell v. Arsenault,* 531 F.3d 993, 997 (9th Cir.2008) (internal quotation marks and citation omitted). In making this inquiry, the court must "[a]ccept[ ] as true the allegations in the complaint," and it "must determine whether the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 997 (9th Cir.2006) (internal quotation marks and citations omitted). "[I]f the factual and legal issues are not sufficiently clear to permit a determination with certainty whether the action was timely[,]" then the court "must" deny a motion to dismiss based on the running of the statute of limitations. *Lee Myles,* 557 F.Supp.2d at 1137 (citing *Supermail Cargo, Inc. v. United States,* 68 F.3d 1204, 1207 (9th Cir.1995)).

Finding no merit to plaintiff's procedural argument, the court is free to turn to the merits of Apollo's statute of limitations argument. As Apollo construes the FAC, plaintiff is proceeding under two related

fraud theories. The first is an alleged "fraudulent scheme" of "backdating ... stock option grants[.]" FAC (doc. 71) at ¶¶ 2 and 6. The second theory, which Apollo terms "an accounting fraud claim[,]" is that due to that alleged "backdating," Apollo issued financial statements which were purportedly "materially false and misleading, resulting in an artificial inflation of [Apollo's] stock price[.]" *Id.* at ¶ 2.

■ As to the first theory, Apollo contends that those backdating claims are barred under 28 U.S.C. § 1658(b). That statute reads as follows:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, ... may be brought not later than the earlier of—
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658(b) (West 2006). Apollo argues that to the extent the FAC alleges a fraudulent option backdating scheme, it is barred under section 1658(b)'s five year statute of repose. A statute of repose, as distinguished from a statute of limitations, is "not subject to equitable tolling." *Munoz v. Ashcroft,* 339 F.3d 950, 957 (9th Cir.2003) (citations omitted). Rather, "[a] statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." *Id.* (citations omitted).

■ "A claim under § 10(b) that is based on the backdating itself accrues on the date the option grant was made." [3] *In*

---

**3.** Plaintiff challenges Apollo's reliance upon three backdating cases because they were derivative, where "the actual granting of a stock option, not the resulting false financial statements," was at issue. Resp. (doc. 94) at 51 (footnote and citations omitted). Regardless of that asserted factual distinction, this court will not consider any of those cases because

in each the court unequivocally stated: "This disposition is *not* designated for publication and may *not* be cited." *In re Apple Computer Inc., Derivative Litig.,* 2007 WL 4170566, at *1 n. 1 (N.D.Cal. Nov.19, 2007) (emphasis added); *In re Atmel Corp. Derivative Litig.,* 2007 WL 2070299, at *1, n. 1 (N.D.Cal. July 16, 2007) (emphasis added); and *In re Ditech*

*re Affiliated Computer Servs. Deri. Litig.,* 540 F.Supp.2d 695, 701 (N.D.Tex.2007) (citation omitted); *see also In re Comverse Tech., Inc. Sec. Litig.,* 543 F.Supp.2d 134, 155 (E.D.N.Y.2008) (citation omitted) ("[T]o the extent that [plaintiffs'] claims are based directly on a backdated grant of options, the 5–year period begins to run on the date the options were granted.") The five option grants which the FAC identifies, *i.e.,* December 18, 1998; April 19, 1999; January 12, 2000; December 15, 2000; and September 21, 2001, all occurred more than five years prior to the filing of this action. Therefore, the court agrees with Apollo that dismissal of those claims is mandated because this lawsuit was not filed until November 2, 2006— "five years and forty-six days after the last of the five grant dates (September 21, 2001)[.]" Mot. (doc. 81) at 11.

Plaintiff buries its response to this argument in a footnote, indicating that the general rule that a backdating claim accrues on the date the option was granted "is not directly at issue in this case[.]" Resp. (doc. 94) at 52, n. 26. Even assuming the applicability of that rule, plaintiff reasons that a backdating claim based upon "[t]he last grant that [it] specifically alleges was backdated[,]" *i.e.* September 21, 2001, would survive this dismissal motion in any event. *Id.* That particular backdating claim is not time-barred, plaintiff hypothesizes, if the September 21, 2001, grants were "backdated by over forty-six days[.]" *Id.* Countering that Apollo has not met its burden of proof on such a claim because it has not shown that that "grant was actually granted before November 2,

2006," plaintiff contends that this particular backdating claim is timely. *See id.*

Plaintiff misconceives the parties' respective burdens at this juncture. Absent any allegations in the complaint, the court declines to speculate, as plaintiff urges, as to whether the September 21st grants were "backdated by over forty-six days," so as to bring them within the five year statute of repose. *See id.* As part of the alleged fraudulent scheme to backdate stock options, the FAC alleges that "[w]hile some of these grants were not publicly reported, several grants reported in Apollo's Forms 10–K had purported grant dates so improbable that backdating is the only plausible explanation." *Id.* at 17, ¶ 48. Among those are grants made "on September 21, 2001[.]" *Id.* at 21, ¶ 52. To the extent plaintiff is asserting a claim for the backdating itself in conjunction with those September 21st grants, as set forth above, such a claim accrues the date those option grants were made. *See Affiliated Computer,* 540 F.Supp.2d at 701 (citation omitted); *see also Comverse Technology,* 543 F.Supp.2d at 155 (citation omitted). Because the present action was not commenced until November 2, 2006, any claims based directly on backdating allegedly occurring on September 21, 2001, are time barred. Accordingly, the court grants Apollo's motion to dismiss as untimely any claims based upon backdating itself with respect to the five option grants set forth earlier.

Turning to what it concedes is the "[t]he gravamen of" the FAC, "the reporting of false and misleading financial results[,]" plaintiff contends that because it is alleg-

---

*Networks, Inc. Derivative Litig.,* 2007 WL 2070300, at *1, n. 1 (N.D.Cal. July 16, 2007) (emphasis added). United States District Court Judge Fogel could not have been more clear. This court will abide by the court's express intention in those cases; none of them will factor into the court's analysis herein.

Apollo was not alone in improperly relying upon cases such as the foregoing. All of the parties had a distressing penchant for relying upon cases where courts, in one way or another, had severely limited the precedential value of their decisions.

ing a "series of fraudulent misrepresentations[,]" the five year repose period began to run "no earlier than 2006[.]" Resp. (doc. 94) at 50 and 51. In essence, plaintiff is urging this court to adopt a theory of continuing wrong so that it can circumvent the five year repose period. Based upon that theory, plaintiff contends that all of its false misrepresentation claims are timely.

■ Primarily because it would run afoul of the general proposition that "the five-year statute of limitations period begins to run on the date of the false representation[,]" the court declines to adopt a continuing wrong or continuing violation theory here. *See Juniper Networks,* 542 F.Supp.2d at 1051 (citations omitted). As in *In re Zoran Corp. Deriv. Litig.,* 511 F.Supp.2d 986 (N.D.Cal.2007), the court finds that the statute of limitations accrues for these false representation claims "when the violation itself occurs, not when the last violation in a series of alleged violations occur." *Id.* at 1014. Accordingly, plaintiff's false representation claims are timely to the extent such misstatements were made during the five-year period of repose. Claims based on misrepresentation statements outside the statute of repose (*i.e.,* prior to November 2, 2001) are not timely, however, and the court grants Apollo's motion to dismiss in that regard.[4] *See Juniper Networks,* 542 F.Supp.2d at 1051 (citation omitted) ("any part of Plaintiffs' § 10(b) claim based on pre-repose period representations is barred even if the injury did not occur until after period began[ ]").

## C. Section 10(b) & Rule 10b–5 Claims[5]

The court will next turn to the core issue of these dismissal motions—"whether plaintiff[ ][has] adequately pled a claim of securities fraud—something that is much harder now than in days gone by." *Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 983 (9th Cir.2008). Indeed, fairly recently the Ninth Circuit observed that "[d]ue in large part to the enactment of the . . . PSLRA, . . plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed.R.Civ.P. 12(b)(6)." *Metzler Inv.,* 540 F.3d at 1055 (citation omitted). Although "formidable," those standards are not insurmountable.

"In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008). Defendants contend that they are entitled to dismissal of plaintiff's 10b–5 claims because plaintiff has not adequately pled three of those elements. More specifically, Apollo maintains that "plaintiff has failed to adequately plead that *any* grants were 'backdat-

---

4. Having found that the five specifically alleged backdated stock option grants are time-barred, there is no need to address Apollo's alternate argument that those claims also fail because the FAC does not include a "legitimate statistical analysis" to support backdating as to those grants. Mot. (doc. 81) at 18. Similarly, there is no need to delve into Apollo's argument that the FAC is deficient because it "does not plead any of the mandatory

specifics" as to the roughly 100 unidentified grants therein. *See id.* No analysis of this issue is necessary because the court assumes by plaintiff's silence that it is abandoning any claims as to fraud based on alleged backdating of grants other than the five which the FAC specifically identifies.

5. Hereinafter section 10(b) shall be read to include Rule 10b–5 as well.

ed[.]' " Mot. (doc. 81) at 12 (emphasis in original). In a similar vein, all defendants argue that plaintiff's misstatement and omissions claims are not pled with the requisite particularity. Next, Apollo challenges the sufficiency of plaintiff's loss causation allegations,[6] whereas the primary thrust of the individual defendants' motion is that the FAC does not adequately plead scienter.[7]

### 1. Particularity

### a. Pleading Standards

### i. Rule 9

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). "In order to allege fraud with particularity, the complaint must both identify the allegedly fraudulent statement and explain why it was false when made." *In re Metropolitan Sec. Litig.*, 532 F.Supp.2d 1260, 1279 (E.D.Wash.2007) (citation omitted). A complaint which "specif[ies] such facts as the times, dates, places, and benefits received, and other benefits of the alleged fraudulent activity[ ]" provides the notice which Rule 9(b) requires. *See id.* at 672 (citations omit-

ted). "Further, a pleader must identify the individual who made the alleged representation and the content of the alleged representation." *In re Hansen Natural Corp. Sec. Litig.*, 527 F.Supp.2d 1142, 1151 (C.D.Cal.2007) (internal quotation marks and citation omitted). The purpose of Rule 9(b)'s heightened pleading requirements is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir.1993) (internal quotations and citation omitted).

■ A complaint which "relies on 'shotgun' or 'puzzle' pleading[ ]" does not meet Rule 9(b)'s particularity requirement. *Metropolitan Sec.*, 532 F.Supp.2d at 1279 (citation omitted). "Shotgun pleadings are those that incorporate every antecedent allegation by reference to each subsequent claim for relief or affirmative defense." *Id.* (internal quotation marks and citation omitted). Puzzle pleadings, which "[c]ourts in this [C]ircuit have *Defazio v. Hollister, Inc.*, 2008 WL 958185, at *3 n. 3 (E.D.Cal. April 8, 2008)" (citing cases), including this one,[8] "are those that require

---

**6.** Originally failure to adequately plead loss causation was not a basis for the individual defendants' dismissal motion. In their Supplemental Brief, however, those defendants specifically "incorporate by reference ... the loss causation aspect of the recent Ninth Circuit decisions ... addressed in Apollo's [supplemental] brief[.]" Supp. Br. (doc. 100) at 5, n. 1. Thus, the court deems the individual defendants to be seeking dismissal for failure to adequately plead loss causation as well.

**7.** "The Ninth Circuit has rejected the concept of collective scienter in attributing scienter to a corporation." *In re International Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *21 (C.D.Cal. May 23, 2008) (internal quotation marks and citation omitted). Accordingly, " '[a] defendant corporation is deemed to have the requisite scienter for fraud *only if*

the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.' " *Id.* (quoting *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir.1995)) (emphasis added). In light of the foregoing, it is understandable that Apollo did not focus heavily upon this element of securities fraud and instead basically adopts the individual defendants' arguments on the issue of scienter. *See* Mot. (doc. 81) at 25; and Supp. Memo. (doc. 102) at 10.

**8.** *Chan v. Orthologic Corp.*, 1998 WL 1018624, at *4 n. 11 (D.Ariz. Feb.5, 1998) ("This tactic not only makes it difficult to ascertain whether any of the allegations have

the defendant and the court to match the statements up with the reasons they are false or misleading." *Metropolitan Sec.*, 532 F.Supp.2d at 1279 (internal quotation marks and citations omitted).

### ii. PSLRA

In addition to satisfying Rule 9(b), a securities fraud plaintiff must meet the PSLRA's "exacting pleading requirements." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007). "The PSLRA requires a heightened pleading standard for allegations regarding misleading statements and omissions that is similar to the heightened pleading standard required by Rule 9(b)." *Hansen*, 527 F.Supp.2d at 1151. More specifically, that Act requires plaintiffs alleging securities fraud "to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (West 1997). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084–85 (9th Cir.2002) (internal quotation marks and citation omitted). Indeed, the detail which § 78u–4(b)(1) demands "is the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts." *Hansen*, 527 F.Supp.2d at

1152 (citation omitted). "By requiring specificity, § 78u–4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv.*, 540 F.3d at 1061 (citation omitted).

By Apollo's count, the FAC identifies 26 allegedly false and misleading statements which defendants issued during the class period. *See* FAC (doc. 71) at ¶¶ 53–87. Plaintiff alleges that those statements were false and misleading as they pertained to: (1) Apollo's "financial results;" (2) "the terms and value of the options granted to [Apollo] officers, directors, and employees;" (3) "the internal controls relating to stock option grants and related financial reporting;" and (4) Apollo's "application" of certain accounting principles and standards pertaining to "accounting for stock option grants." *Id.* at ¶ 53. The FAC goes on to allege, broadly stated, that in each of the years 2002–2006 Apollo issued a series of press releases providing quarterly fiscal results. Although the FAC does not allege that those press releases contained "false financial results[,]" given plaintiff's manner of pleading, that is the obvious inference. *See, e.g., id.* at ¶ 54 ("On March 26, 2002, Apollo issued a press release entitled 'Apollo Group Inc. Reports Fiscal 2002 Second Quarter Results.' These false financial results were reported in Apollo's Form 10–Q, which was filed with the SEC on April 12, 2002.") The FAC also alleges that those purportedly false results were in turn "repeated" in Apollo's Form 10–Qs and 10–Ks, which it filed with the SEC. *See, e.g., id.* at ¶¶ 54; 57; 72; and 76.

*more merit than others, it also makes the complaint dreadfully oversized ... [and]*

*make[s] a mockery of Rule 9(b).")*

After enumerating the supposedly false and misleading statements for each of the years from 2002–2006, plaintiff sets forth what it deems to be "[t]he true facts known at the time[.]" *Id.* at ¶¶ 59(a)-(f); 65(a)-(f); 74(a)-(g); 81(a)-(f); and 87(a)-(g). With a few minor exceptions, those "true facts" are identical for each of the class period years and are set forth in full below:

(a) Apollo's 2000, 2001, and 2002 financial results, including its net income, earnings per share, and profit and gross margins, were all materially overstated due to *contrivances and manipulations* in the administration of Apollo's stock options, including backdating and failing to properly record or account for the actual amount and tax consequences of compensation expenses of its executives;

(b) Apollo's financial and operating results reported during the Class Period were not entirely due to the skill and business acumen of its top executives, their successful management of its business or the outstanding performance of its business units, as represented; in fact, a significant part was due to falsification of Apollo's financial statements by not properly accounting for (and thus understating) the true compensation expenses of its executive and management team;

(c) Apollo's top executives and directors were manipulating the Company's stock option plans to provide themselves with millions of dollars in undisclosed income by backdating stock option grants to a much lower exercise price thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties and even criminal proceedings;

(d) Apollo's internal financial and accounting controls were *materially deficient* and *not effective in providing the necessary and required degrees of as-surance that Apollo's financial results and reports were fairly and accurately presented and free from fraud;*

(e) Senior management's salaries and option grants had not been determined as a result of arm's-length negotiation with Apollo's Compensation Committee, but rather were the product of cronyism and undisclosed conflicts of interest; and

(f) Because Apollo's historical and current financial results were overstated, defendants' forecasts of Apollo's future financial performance were false and could not be achieved.

*Id.* at ¶¶ 59(a)-(f) (emphasis added); *see also* FAC at ¶¶ 65(a)-(f); ¶¶ 74(a)-(d) and ¶¶ 74(f)-(g); ¶¶ 81(a)-(f); and ¶¶ 87(a)-(f).

An additional "true fact" in 2004 was that purportedly "Apollo had not taken the required compensation expenses for its conversion of University of Phoenix Online common stock." *Id.* at ¶ 74(e). Likewise, in 2006 the FAC alleges two other "true facts[:]" (1) "Apollo's June 9, 2006 denial of stock option backdating was false and misleading as discussed *infra* [;]" and (2) "Apollo's January 11, 2006 press release regarding the resignation of Nelson omitted material facts regarding the circumstances of [his] resignation." *Id.* at ¶¶ 87(g)-(h).

To illustrate its view that plaintiff has not pled fraud with the requisite degree of particularity, Apollo points out that the FAC alleges that an April 12, 2002, SEC filing contained "false financial results[.]" *Id.* at ¶ 54. Yet, when the FAC later alleges that such financial results were "due to contrivances and manipulations in the administration of Apollo's stock options," *id.* At ¶ 59(a), it fails to "connect-the-dots" in terms of explaining what is meant by "contrivances and manipulations[,]" and how such actions relate to the earlier allegations of false financials.

*See In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 991 (D.Ariz.1999) (footnote omitted) ("The court should not have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim.") Apollo further challenges the sufficiency of plaintiff's fraud allegations for failing to specify the supposedly backdated stock options as they relate to particular "false financial results." Apollo adds that given the overly broad and vague nature of the FAC, it is impossible to ascertain, among other things, whether plaintiff is relying upon time-barred backdated stock options.

The individual defendants, as does Apollo, take plaintiff to task for essentially cutting and pasting and "simply parrot[ing] lengthy ... quotes from Apollo's public filings" without identifying the specific statement therein which supposedly is false. Mot. (doc. 82) at 23. The individual defendants also challenge the sufficiency of plaintiff's fraud allegations because of the lack of detail as to "why the unidentified misleading statements are purportedly false." *Id.*

Essentially plaintiff counters that it has complied with the heightened pleading requirements for fraud in that it is alleged *"where* and *when"* each false and misleading statement was made; *"who* made" it; "and a fraudulent course of conduct demonstrating *why* each statement was false and misleading." Resp. (doc. 94) at 29 (emphasis in original). Apollo's May 22, 2007, Restatement is the primary basis for plaintiff's claims that the 26 identified statements were all false and misleading.

The court agrees with defendants that the FAC does not satisfy the heightened pleading standards for fraud under either Rule 9(b) or the PSLRA. In its current form the FAC is a puzzle-like pleading which the court cannot countenance. The cut and paste nature of the FAC is troubling. Perhaps the most troubling aspect

of the FAC as currently pled is that the "vague allegations of deception" are "unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *See Metzler Inv.,* 540 F.3d at 1061 (citation omitted). Further, as in *Metropolitan Sec.,* "it is difficult and laborious to determine which portions" of the quoted press releases and SEC filings "are allegedly false and which false statements are attributed to any particular defendant." *See Metropolitan Sec.,* 532 F.Supp.2d at 1279. The FAC " 'often rambles through long stretches of material quoted from defendants' public statements ... unpunctuated by any specific reasons for falsity.' " *See id.* (quoting *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547–48 (9th Cir.1994)) (other citation omitted).

The court will not take the "drastic step of dismissal based on the form of the pleading[,]" however. *See In re Cornerstone Propane Partners, L.P., Sec. Litig.,* 355 F.Supp.2d 1069, 1081 (N.D.Cal.2005) (citation omitted). Rather, in accordance with "the Ninth Circuit['s] recommend[ation] [,]" the court will "require[ ] ... plaintiff to 'streamline and reorganize the complaint before allowing it to serve as the document controlling discovery.' " *See Metropolitan Sec.,* 532 F.Supp.2d at 1280 (quoting *GlenFed,* 42 F.3d at 1554) (other citation omitted); *see also Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1053 (9th Cir.2003) (abuse of discretion to dismiss FAC with prejudice for failure to provide the detail which PSLRA requires where, *inter alia,* plaintiff alleged with requisite detail who, what, when and by whom false statements were made, but did not " 'plead sufficiently how and why the financial statements were false' "). In so doing, plaintiff must be "clear and concise in identifying the false statements and articulating the factual allegations supporting an inference that the statement is false

or misleading." *See Patel v. Parnes,* 253 F.R.D. 531, 554 (C.D.Cal.2008) (internal quotation marks and citation omitted). The FAC in its current form makes it difficult, if not impossible, to evaluate and determine whether the PSLRA's particularity requirements are met. This task may be both "challenging and burdensome," but as the court astutely observed in *Metropolitan Sec.,* 532 F.Supp.2d at 1278, "the American legal system places this [pleading] burden on the party seeking relief, rather than the party responding to a claim." *See id.* "Nor is it appropriate for a trial court to effectively involve itself in the drafting process by puzzling out the details of a plaintiff's claims." *Id.*

Assuming that plaintiff can successfully amend its complaint to comply with the dictates of the PSLRA in terms of pleading false and misleading statements or omissions, the court will next address defendants' scienter and loss causation allegations.

. . .

### 2. Scienter

#### a. Pleading Standards

■■■■ The PSLRA also has a heightened pleading standard for scienter. "[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Metzler Inv.,* 540 F.3d at 1066 (internal quotation marks and citation omitted). "The requisite recklessness must be an extreme departure from the standards of ordinary care, and ... present [ ] a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Patel,* 253 F.R.D. at 555 (internal quotation marks and citations omitted). In other words, "reckless con-

duct" can meet the PSLRA, but only "to the extent that it reflects some degree of intentional or conscious misconduct, or what [the Ninth Circuit] has called deliberate recklessness." *South Ferry, supra,* 542 F.3d at 782 (internal quotation marks and citation omitted). This pleading requirement is met when the complaint "contain[s] allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statement when made." *Metzler Inv.,* 540 F.3d at 1066 (internal quotation marks and citation omitted).

■■■■ The PSLRA "place[s] an additional gloss on the scienter requirement[.]" *Id.* Pursuant to the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (West 1997). Congress did not define "strong inference," resulting in divergent views as to what constitutes a "strong inference." Setting out "to prescribe a workable construction" of the "strong inference standard," the Supreme Court in *Tellabs* adopted a holistic approach, *i.e.* "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 322–23, 127 S.Ct. at 2509 (citations omitted). "[A]ssess[ing] all [of] the allegations holistically[ ]" is necessary, the *Tellabs* Court explained, because "[t]he strength of an inference cannot be decided in a vacuum." *Id.* at 325 and 323, 127 S.Ct. at 2511 and 2510. While acknowledging that the PSLRA "unequivocally raised the bar for pleading scienter[,]" the *Tellabs* Court held that pleading facts suggesting a "plausible" inference of scienter does not satisfy that statute. *Id.* at 321, 127 S.Ct. at 2509 (internal quotation marks and citation omitted). Instead, a "strong

inference" of scienter can only be shown by "plead[ing] with particularity facts that give rise to a ... powerful or cogent ... inference" of scienter. *Id.* at 323, 127 S.Ct. at 2510 (citations omitted).

In determining the strength of any given inference, "[t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* When undertaking such a comparison, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* Clarifying, the *Tellabs* Court stated that "the inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences[.]" *Id.* (internal quotation marks and citation omitted). Likewise, although defendants herein suggest to the contrary, "to carry their burden on scienter, Plaintiffs ... do not need to invalidate the inferences which Defendants raise." *See McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *7 (W.D.Wash. Dec.5, 2008).

"Yet the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324, 127 S.Ct. at 2510. As the Ninth Circuit recently put it, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir.2009') (citing *Tellabs*, 551 U.S. at 324, 127 S.Ct. at 2510; and *Metzler Inv.*, 540 F.3d at 1066). Thus, after *Tellabs* "[a] complaint will survive [a motion to dismiss] ... only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as an opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. at 2510 (footnote omitted).

In the present case, arguing that plaintiff has not adequately pled scienter, Apollo stresses that the standard for pleading scienter in the Ninth Circuit is "more stringent" than in other Circuits, Mot. (doc. 81) at 26 (citing *No. 84 Employer-Teamster v. America West Holding*, 320 F.3d 920, 931 n. 8 (9th Cir.2003))—a point which is implicit in the individual defendants' argument. Until fairly recently, that was an accurate description of the scienter pleading standards in this Circuit.

The Ninth Circuit in *South Ferry*, however, revisited the issue of the "level of detail required under the PSLRA[ ]" when pleading scienter. *South Ferry*, 542 F.3d at 784. As one commentator describes it, *South Ferry* "represents a seismic shift in the [Ninth] Circuit's analysis of securities fraud complaints and significantly lowers the bar for pleading scienter[.]" 14 No. 11 Andrews Sec. Litig. & Reg. Rep. 2 (Oct. 7, 2008) (footnote omitted). That commentator further described *South Ferry* as a "sea change in scienter pleading standard by the [Ninth] Circuit[.]" *Id.* That "seismic shift" or "sea change" is due to the Ninth Circuit's explicit repudiation in *South Ferry* of its prior securities fraud pleading standards as set forth in *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir.2003); *Vantive, supra*, 283 F.3d 1079; and *Silicon Graphics, supra*, 183 F.3d 970. Cognizant that "perhaps" it had been "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations [of scienter] outright" in that trilogy of pre-*Tellabs* cases, the Ninth Circuit found that "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirements, th[os]e prior holdings ... notwithstanding." *South Ferry*, 542 F.3d at 784.

In conformity with *Tellabs,* and retreating from its prior holdings, the Ninth Circuit further found that "[v]ague or ambiguous allegations are now properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id.* (citation omitted).

Recognizing that while *"Tellabs* suggests that ... a high level of detail is required under the PSLRA," the *South Ferry* Court stressed that "a court should look to the complaint as a whole, *not* to each individual scienter allegation as *Silicon Graphics* suggests." *Id.* (emphasis added). Thus, the Ninth Circuit explicitly instructed courts "to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *Id.* Taking the "holistic[ ]" approach which *Tellabs* mandates, the *South Ferry* Court opined that "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id.*

### b. Argument Summary

Plaintiff points to a number of allegations which from its standpoint give rise to "a strong inference of scienter with respect to [Apollo's] false financial reporting resulting from undisclosed stock option backdating, and its failure to properly account for such backdating." Pl. Supp. Br. (doc. 101) at 2. First, plaintiff relies upon allegations of backdating stock options to show "that it is 'at least as likely' that defen-

dants possessed the requisite scienter" as to "their statements regarding stock options granting and accounting[.]" Resp. (doc. 94) at 23–24. Another way plaintiff believes it has sufficiently alleged scienter is based upon circumstances which when taken together show deliberate recklessness "with respect to Apollo's stock option granting practices." *Id.* at 25. Basically those circumstances are: (1) the Restatement (2) "false SOX [Sarbanes–Oxley] certifications"[;] (3) resignations of Apollo executives and directors; and (4) defendants' financial gain.[9] *Id.* at 36; and 39. Invoking *Tellabs'* competing inferences analytical framework, plaintiff maintains that not only has it raised a cogent and compelling inference of scienter, but defendants have not "raise[d] a single reasonable competing inference that could counter [these] allegations." *Id.* at 58.

As the individual defendants construe the FAC, in addition to the foregoing, plaintiff is endeavoring to allege scienter by relying upon defendant Mueller's assurance of no backdating. As more fully explained below, the individual defendants strongly contend that each of plaintiff's allegations "fall woefully short[ ]" of the standard necessary to adequately plead scienter. Mot. (doc. 82) at 13.

Similarly, Apollo maintains that plaintiff has "utterly failed" to adequately plead scienter. Mot. (doc. 81) at 26. Essentially adopting the individual defendants' scienter arguments,[10] Apollo high-

---

9. Plaintiff is also attempting to rely upon the jury verdict in *In re Apollo Group, Ins. Sec. Litig.,* CV 04–2147 (D.Ariz.), finding Apollo, and defendants Nelson and Gonzales liable for securities fraud. As noted earlier, however, Judge Teilborg set aside that verdict. *See In re Apollo Group, Inc. Sec. Litig.,* 2008 WL 3072731 (D.Ariz. Aug.4, 2008). Thus, assuming that verdict otherwise had any bearing on the present action, plainly it no longer does. Consequently, the court will not take into account that verdict in evaluating the suffi-

ciency of plaintiff's scienter allegations herein.

10. Apollo's tack is understandable given that ordinarily as a corporation, Apollo can be " 'deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter.' " Mot. (doc. 81) at 25 (quoting *In re Apple Computer, Inc., Sec. Litig.,* 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002)) (citing, in turn, *Nordstrom, Inc. v. Chubb & Son, Inc.,*

lights that the Restatement alone is an insufficient basis for inferring scienter. Apollo adds that plaintiff cannot rely upon the corporate titles and responsibilities of the individual defendants to plead scienter because that is tantamount to impermissible "group pleading." *Id.* Lastly, Apollo notes that the individual defendants' stock sales during the Class Period also do not provide a sufficient basis for pleading scienter.

The dominant theme of defendants' scienter argument is that each of the actions complained of, standing alone, is insufficient to create a strong inference of such. Hence, the court should dismiss the FAC for failure to adequately plead scienter. Painstakingly deconstructing each of the FAC's scienter allegations and the competing inferences which can be drawn therefrom, and insisting on viewing each such allegation in isolation, was problematic even after *Tellabs*. *See Metzler Inv.*, 540 F.3d at 1069 (observing, based upon *Tellabs*, that "a defendant cannot gain dismissal by de-contextualizing every statement in a complaint that goes to scienter[ ]"). That approach is even more problematic now given evolving Ninth Circuit standards for pleading scienter. In *Zucco*, the Ninth Circuit recently acknowledged that it had "yet to fully explain how the [Supreme] Court's *Tellabs* decision relates to much of [its] [prior] analysis" of scienter pleading standards under the

PSLRA. *Zucco*, 552 F.3d at 987. Clarifying, the Ninth Circuit now views " '*Tellabs* [as] permit[ting] a series of less precise allegations to be read together to meet the PSLRA requirement.' " *Zucco*, 552 F.3d at 1006 (quoting *South Ferry*, 542 F.3d at 784). It also recognizes that " '[v]ague or ambiguous allegations are now properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter.' " *Id.* (quoting *South Ferry*, 542 F.3d at 782).

"[R]ecognizing that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter[,]" the *Zucco* Court further explained that it now "read[s] *Tellabs* to mean that [its] prior, segmented approach is not sufficient to dismiss an allegation of scienter." *Id.* at 991. Indeed, in *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156 (9th Cir.2009), the Ninth Circuit explicitly recognized that it "can no longer summarily dismiss a complaint whose individual allegations are insufficient under the PSLRA." *Id.* at 1165. Instead, a court must "conduct a dual inquiry." *Zucco*, 552 F.3d at 992. "First, [it] will determine whether any of ... plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter[.]" *Id.* "Second, if no individual allegations are sufficient, [the court] will conduct a 'holistic' review of the same allegations to determine whether the insuffi-

---

54 F.3d 1424, 1435–36 (9th Cir.1995)). As the Ninth Circuit recently made clear though, it has not completely foreclosed the possibility of "collective scienter," *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 744 (9th Cir.2008), i.e. where "[t]he knowledge necessary to adversely affect the corporation does not have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation." *Nordstrom*, 54 F.3d at 1435 (internal quotation marks and citation omitted).

In the present case, to the extent plaintiff may be urging application of the collective

scienter doctrine, the court declines to do so. That doctrine does not come into play here because the FAC's scienter allegations are not akin to "circumstances in which a company's public statements were so important and so dramatically false," such as the hypothetical example mentioned in *Glazer Capital* where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero[,]" so as to justify allowing this method of pleading scienter. *See id.* at 743 (citation omitted).

cient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* So, while holding that *"Tellabs* does not materially alter the particularity requirements for scienter claims established in [its] previous decisions[,]" at the same time the *Zucco* Court held that *Tellabs* "adds an additional 'holistic' approach to those requirements[.]" *Id.* at 987.

▇▇▇ Consistent with that recently espoused view, a court must "determine whether the complaint contains an inference of scienter that is greater than the sum of its parts." *Rubke,* 551 F.3d at 1165 (citations omitted); *see also Glazer Capital,* 549 F.3d at 745 (internal quotation marks and citation omitted) ("To determine whether [plaintiff] has met the PSLRA pleading requirements, [the Court] must determine whether these five events [which plaintiff claimed supported an inference of scienter], even though individually lacking, are sufficient to create a strong inference of scienter."). In accordance with the dual inquiry approach adopted by the Ninth Circuit in *Zucco,* first the court will individually examine each of plaintiff's scienter allegations, standing alone, to determine whether they are sufficient to create a strong inference of scienter. If necessary, *i.e.,* "if no individual allegations are sufficient," the court will then conduct a holistic review of those same allegations. *See Zucco,* 552 F.3d at 992.

### c. Individual Scienter Allegations

### i. Stock Option Backdating

▇▇▇ The principle means by which plaintiff is attempting to show scienter is through allegations of stock option backdating. Defendants construe the FAC as alleging that Apollo has " 'admitted' to backdating[ ]' " —an admission and an allegation which they vehemently deny. Mot. (doc. 82) at 13 (citing FAC at ¶ 2.)

Thus, defendants reason, plaintiff cannot rely upon that supposed admission to establish that they had the requisite scienter. The parties spill much ink over whether defendants have admitted backdating, which is the underpinning of plaintiff's accounting fraud claims. At this juncture, there is no need to become mired down in whether defendants have "admitted" to backdating because the FAC sufficiently *alleges* that they engaged in such conduct regardless of any purported "admission." At this pleading stage, nothing more is required. *See Edmonds v. Getty,* 524 F.Supp.2d 1267, 1274 (W.D.Wash.2007) (citation omitted) ("[A]t the pleading stage, the plaintiff need not prove that backdating occurred but rather must only allege circumstances from which it may be reasonably inferred that backdating as opposed to an innocent bookkeeping error occurred.")

The FAC alleges that "several grants . . . had purported grant dates so improbable that backdating is the only plausible explanation." FAC (doc. 71) at ¶ 48. From defendants' viewpoint, this is nothing more than a "self-serving conclusion" which does not plead scienter. Mot. (doc. 82) at 15. Rather than alleging a scheme to fraudulently backdate stock options, the individual defendants construe the FAC as alleging nothing more than "simple accounting errors and sloppy recordkeeping"—allegations which cannot support a finding of scienter. *See* Supp. Br. (doc. 100) at 3. Similarly, Apollo charges plaintiff with improperly "lump[ing] Apollo's innocuous accounting mistakes with nefarious retroactive pricing[,]" in an effort to plead scienter. Reply (doc. 97) at 7.

Although it is a close call, when read together, a number of allegations support a finding that the inference of backdating is "at least as compelling as any opposing inference" of innocent bookkeeping error.

*See Tellabs,* 551 U.S. at 324, 127 S.Ct. at 2510 (footnote omitted). *Tellabs* and its progeny require nothing more. In fact, as one court within this district has astutely observed, "[t]he Supreme Court [in *Tellabs*] has now made clear, ... that a tie goes to the Plaintiff[ ]" in terms of competing inferences as to scienter. *Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.,* 525 F.Supp.2d 1116, 1120 (D.Ariz.2007). At this relatively early stage in the litigation, the court endorses this tie-breaking approach.

In the present action, the FAC alleges that in conducting their own "investigation" Apollo explicitly acknowledged that it "prepared and maintained inaccurate documentation concerning the date that grant award lists were completed and approved." FAC (doc. 71) at ¶ 115(a) (internal quotation marks omitted). This allegation is akin to the "admission" in *Middlesex* which the court found, along with other allegations, "lean[ed] heavily toward a finding of scienter." *Middlesex,* 527 F.Supp.2d at 1181. The *Middlesex* complaint alleged that defendant "admitted that accounting measurement dates for most of the stock option grants to employees from July 1998 and May 2002 differed from the recorded grant dates." *Id.* (internal quotation marks and citation omitted). In a similar vein, here the FAC alleges that " 'Apollo has admitted in its Form 10–K for the year ending August 31, 2006 that 57 of the 100 total grants made during this time period used incorrect measurement dates for accounting purposes.' " FAC (doc. 71) at ¶ 47.

Further, other allegations detailed below, much like those in *Middlesex,* amount to "extremely fortunate [grant] dates [which] give rise to a strong inference that backdating has occurred and that it was done intentionally." *See Middlesex,* 527 F.Supp.2d at 1182. More specifically, the FAC alleges that on December 18, 1998, "[d]efendants dated certain of Apollo's 1998 option grants ... at $11.39 per share[,]" which "was nearly the low for the month of December when Apollo's stock traded between $10.22 and $15.06 per share." FAC (doc. 71) at ¶ 49. On that date the Sperling defendants, as well as defendants Nelson, Gonzales, and Noone, allegedly made a 10 day return on those options totaling $2,396,520.00. *Id.*

The FAC further alleges that on April 19, 1999, Apollo dated option grants at "the low of the month[,]" with defendant Gonzales receiving 20,000 options at that price. *Id.* at ¶ 50. Allegedly, that particular option grant resulted in a five day return to Ms. Gonzales of $35,000.00. *Id.* The FAC also alleges that "[d]efendants dated many of Apollo's 2000 grants as of January 12, 2000 at $8.39 per share (split adjusted)—*not only the low of the month but also the low of the year.*" *Id.* at ¶ 51 (emphasis in original). The FAC continues, alleging that during 2000 Apollo's "stock traded as high as $11.33 per share in January and as high as $22.14 per share[.]" *Id.*

Later in 2000, the FAC alleges that Apollo dated "many of [its] grants as of December 15, 2000 at $14.84 per share (split adjusted) [.]" *Id.* (emphasis in original). Allegedly that share price was *"not only the low of the month but also the low for the fourth quarter of 2000."* *Id.* (emphasis in original) Plaintiff asserts that this particular stock grant "involved suspicious timing" in that "two days later Apollo issued better than expected results which caused a dramatic and immediate climb in the Company's stock." *Id.* According to the FAC, "[b]y December 20, 2000—a day after the earnings release—Apollo's stock closed at $20.89 per share." *Id.* Then, the stock purportedly "hit its high for the year of $22.14 per share a few days later on

December 28, 2000—*a 49% increase in eight trading days."* *Id.* (emphasis in original). The Sperling defendants and defendants Nelson, Gonzales and Noone allegedly were granted a total of 270,000 options on December 15, 2000, with a total five day return of $3,877,200.00 *Id.*

Finally, the FAC alleges that on September 21, 2001, "[d]efendants dated Apollo's ... option grants ... at $23.22 per share—*not only the low of the month but also the low for the second half of 2001."* *Id.* at ¶ 52 (emphasis in original). To support that assertion, the FAC further alleges that Apollo's "stock traded as high as $28.02 per share in September [2001] and as high as $32.03 per share in the second half of th[a]t year." *Id.* Again the FAC alleges that the Sperling defendants, as well as defendants Nelson, Gonzales, and Noone and, this time, defendant Bachus, received stock options with high returns. More specifically, allegedly those defendants received a total of 385,000 options on September 21, 2001, with a five day return totaling $2,705,550.00. *Id.*

These dates, with one exception, appear to reflect at a minimum the lowest price of the month, and in one instance the lowest price for the year. Additionally, as to the December 15, 2000 date, allegedly the grant price immediately preceded a 49% increase in the price of Apollo's stock—a significant price increase by any measure. *See id.* at ¶ 51. Not only that, like the *Middlesex* court, this court cannot ignore "[t]he fact that none of the option grant dates resulted in less-than-favorable results for Defendants[,]" which "also gives rise to a strong suggestion that the improper dating of options was intentional." *See Middlesex,* 527 F.Supp.2d at 1182. Bolstering the inference of intentional backdating here are the charts in the FAC showing Apollo's stock price history. Also as in *Middlesex,* those charts, when "overlaid with demarcations reflecting the date

of the option grants at issue (as has been done in Plaintiff's FAC)," strengthen the inference of backdating. *See id.*

The FAC does not include a statistical analysis as part of its backdating allegations. Initially the court found this omission somewhat troubling given defendants' position that such an analysis is a necessary predicate to pleading backdating. A careful reading of the cases to which defendants cite, however, reveals that while a statistical analysis may be preferable, and certainly would strengthen the backdating allegations herein, at this point the lack of such an analysis is not fatal.

To illustrate, *In re Computer Sciences Corp. Deriv. Litig.,* 2007 WL 1321715 (C.D.Cal.2007), the court recognized that "the detailed statistical that the plaintiffs employed in" another case was "not necessary to making particularized allegations of backdating." *Id.* at *14. Likewise, in *CNET Networks, supra,* 483 F.Supp.2d 947, the court did fault plaintiffs for alleging that they had "employ[ed] a widely accepted analytical model for detecting backdated options," when all they had done was to "merely look[ ] at the stock price movement." *Id.* at 957. Significantly, however, the court was quick to point out that it "would not necessarily require plaintiffs to perform a complex financial analysis at the pleading stage." *Id.* at 958–957. In fact, the court expressly stated that "[s]ound analytical methods are *one way* that plaintiffs could have eliminated the possibility that the returns from the grants were the product of dumb luck." *Id.* at 958 (emphasis added). Although the court in *CNET* reasoned that "[w]ithout such models, that inference is more difficult to support[,]" it did not require such models. *Id.* In fact, even without a "sound analytical method," after scrutinizing the eight alleged grants at issue therein, the *CNET* court found that plaintiff had suffi-

ciently pled facts supporting an inference that three of the eight grants at issue therein were backdated.

That is not to say that at some point in this litigation plaintiff's backdating allegations cannot be defeated due to the lack of a sound financial analysis, but not now. The court is all the more reluctant to require a complex, detailed statistical analysis at this particular juncture given the Ninth Circuit's explicit recognition even "vague or ambiguous" scienter allegations may survive a motion to dismiss, as well as a "series of less precise allegations[,] [when] read together[.]" *South Ferry,* 542 F.3d at 784 (citation omitted).

### ii. Deliberately Reckless

Having found plaintiff sufficiently pled backdating, "the question … becomes whether Plaintiff has adequately pled that Defendants either knew of the backdating, or were deliberately reckless in not knowing of the backdating." *See Middlesex,* 527 F.Supp.2d at 1182. Plaintiff relies upon a series of circumstances, the totality of which it believes show deliberate recklessness in terms of Apollo's stock option granting practices. As noted earlier, those circumstances are: (1) the Restatement (2) "false SOX certifications"[;] (3) the "mass exodus" of Apollo executives and directors; and (4) defendants' financial gain. Resp. (doc. 94) at 36 and 39.

### (a) Restatement/GAAP Violation

The parties offer diametrically opposing views as to the impact of the Restatement on the court's scienter analysis. Plaintiff contends it "supports a strong inference of scienter[,]" Resp. (doc. 94) at 30, whereas defendants retort that the Restatement actually "shows the absence of scienter[.]" Mot. (doc. 82) at 13. Although not without its weaknesses, plaintiff's argument is the stronger one, at least at this juncture.

A strong inference of scienter can be drawn from the Restatement, according to plaintiff because it confirms that "[i]n the accounting of certain stock option grants, [Apollo] did not correctly apply the requirements of APB 25[,][i]n certain instances" using an improper measurement date for option awards. FAC (doc. 71) at 62, ¶ 106 (internal quotation marks omitted). Additionally, plaintiff stresses that the Restatement also confirms that Apollo "prepared and maintained inaccurate documentation concerning the date that grant award lists were completed and approved." *Id.* Lastly, plaintiff hones in on the Special Committee's "report[ ] to [Apollo's] Board that certain former officers took steps that may have been intended to mask failures in the grant approval process with respect to [Apollo's] financial reporting and payment of taxes[,]" as the Restatement recites. *Id.* (internal quotation marks omitted).

██ The court is well aware that "mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco,* 552 F.3d at 1000; *see also In re Marvell Technology Group Ltd. Sec. Litig.,* 2008 WL 4544439, at \*6 (N.D.Cal. Sept.29, 2008) (citation omitted) ("To the extent … Plaintiffs seek to rely solely on the restatement of financials, plaintiffs cannot show scienter solely by pointing to the fact that Marvell restated its financial statements."). The court is equally well aware that " '[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.' " *Rudolph v. UTStarcom,* 2008 WL 4002855, at \*5 (N.D.Cal. Aug.21, 2008) (*"UTStarcom II"*) (quoting, *inter alia, DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002)) (other quotation marks and citations omitted) (emphasis added); *see also Cornerstone, supra,* 355

F.Supp.2d at 1091 ("The majority of circuits have clearly held that standing alone, allegation of GAAP or SEC regulations do not establish scienter.") This is so even if the GAAP violations are "significant" or "requir[e] large or multiple restatements[.]" *Rectifier, supra,* 2008 WL 4555794, at *13 (footnote and citations omitted); *but see Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *13 (C.D.Cal. July 1, 2008) (footnote omitted) ("[S]ignificant violations of GAAP [alleged overstatement of revenues by over 30 and 40%], taking place over an extended period of time [nearly every quarter for roughly three years], g[a]ve rise to a strong inference of scienter.")

■ Rather, to create a strong inference of scienter based upon a restatement or alleged GAAP violations, those allegations "must be augmented by other specific allegations that defendants possessed the requisite mental state." *Rectifier,* 2008 WL 4555794, at *13 (collecting cases). Courts have variously described these additional allegations, requiring "specific allegations that the defendant had actual knowledge of relevant facts from which scienter could be inferred[,]" *In re U.S. Aggregates, Inc. Sec. Litig.,* 235 F.Supp.2d 1063, 1073 (N.D.Cal.2002), or similarly requiring that allegations of GAAP violations "be underpinned by other particularized allegations that defendants possessed the requisite mental state." *Cornerstone,* 355 F.Supp.2d at 1091.

Apart from defendants Nelson, Norton and Blair, missing from the FAC are any "specific or particularized" allegations that the other individual defendants had the requisite mental state *vis-a-vis* the Restatement. Therefore, the Restatement standing alone does not support a strong inference of scienter as to those defendants. Plaintiff's bald assertion that "failure to adhere to APB 25 and properly record compensation expense for millions of dollars worth of stock options[ ]" was "part and parcel" of defendants' alleged fraudulent scheme, Resp. (doc. 94) at 31, is not the type of specific or particularized allegation which can form the basis for a strong inference of scienter. *See Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1167 (D.Ariz.2005) (in considering GAAP violations, allegations of scienter insufficient as to defendants "given the lack of specific allegations about those defendants' personal involvement[ ]"). Similarly unavailing is plaintiff's contention that scienter can be shown due to the "nature" of the Restatement in that "the earlier false financial results were only achieved by violating Apollo's own stated accounting polices and stock option plans." *Id.* (citing FAC at ¶ 46). Plainly this allegation also lacks the necessary detail from which an inference can be drawn that unspecified defendants had the requisite state of mind.

On the other hand, based directly on the Restatement, the FAC "details the[ ] extensive involvement" of defendant Nelson, Apollo's former CEO, and defendant Norton, the Chairman of the Compensation Committee, and defendant Blair, a member of that Committee, "in the options granting process[,]" and hence their access to information as to that process. *See* Resp. (doc. 94) at 35. Plaintiff highlights a number of allegations, including the following, in that regard:

* Apollo's Board or Compensation Committee [*i.e.* Messrs. Blair and Norton] was primarily responsible for selecting the grant dates. *See* FAC (doc. 71) at ¶ 115(b).

* "Management Grants ... required approval by both members of the Compensation Committee." *Id.* at ¶ 115(c).

* Apollo's internal investigation revealed "Approval Memoranda signed by the Compensation Committee for grants to [Nelson]." *Id.* at ¶ 115(d).

* "In many instances, the [Grant] Approval Memorandum was signed by only the Chairman of the Compensation Committee [Norton] and we lack evidence as to whether all of the grants issued, were, in fact, approved by a majority of the members of th[at] ... Committee." *Id.* at ¶ 115(e).

* Nelson typically attended Compensation Committee meetings where option grants were discussed and approved. *See id.* at ¶ 117(e).

* Beginning in August, 2001 either Nelson or the Compensation Committee signed the memoranda approving grants to all employees. *See id.* at ¶ 117(c).

Undertaking the "comparative" inquiry which *Tellabs* elucidates, there is a strong inference of scienter as to defendants Norton, Nelson and Blair in light of their extensive involvement with the grant process as the Restatement indicates. These allegations permit a strong inference of scienter to be drawn as to defendants Nelson, Norton and Blair with respect to the falsity of their statements regarding Apollo's stock option granting practices, especially when read in conjunction with other scienter allegations.

Despite the foregoing, defendants insist that the Restatement actually "shows the absence of scienter[,]" partly because it states that "'[t]he Special Committee has found no direct evidence that the grant date for any of the large Management Grants was selected with the benefit of hindsight.'" Mot. (doc. 82) at 13 (quoting FAC at 62, ¶ 106). They also point to the fact that following its investigation, the SEC did not recommend any enforcement action. Morris Decl'n. (doc. 83), exh. 10 thereto. Thus, from defendants' perspective the Restatement is nothing more than a "simple statement that Apollo misapplied certain complicated accounting rules." *Id.* at 14 (footnote omitted). Hence, it does

not support a strong inference of scienter as to any of the defendants.

Neither of these arguments are persuasive. The Special Committee's "no direct evidence" finding does not alter the court's conclusion that at least as to defendants Nelson, Norton and Blair, the Restatement squarely contributes to a finding of scienter. Moreover, despite what defendants imply, the SEC's decision not to take any enforcement action does not undercut a finding of scienter. The SEC's determination is irrelevant to this court's scienter analysis because, in the first instance, as the FAC accurately states, "the SEC's decision not to take action can 'in no way be construed as indicating that the party has been exonerated' and any 'attempted use ... as a purported defense in any action ... would be clearly inappropriate and improper[.]'" FAC (doc. 71) at 58, n. 4 (quoting *SEC Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations*. 1082 SEC LEXIS 238 at *7). Secondly, "like the *Batwin* defendants, defendants herein do not cite to any authority for the proposition that the SEC's discretionary decision not to institute enforcement proceedings should be taken into consideration in determining whether a plaintiff's allegations as to scienter pass muster under the PSLRA." *Batwin*, 2008 WL 2676364, at *13 n. 7. Therefore, the court abides by its ruling that the Restatement provides at least some basis for finding that defendants Nelson, Norton and Blair had the requisite scienter, especially when considering the FAC as a whole.

### (b) SOX Certifications

The FAC further specifically alleges that defendant Nelson "signed false and misleading SOX certifications which falsely attested to the adequacy of [Apollo's] in-

ternal controls, and the accuracy of [Apollo's] reported financial statements." FAC (doc. 71) at ¶ 120. The FAC does not expressly allege that defendant Gonzales also signed false and misleading SOX certifications. However, it does allege that she was "at least deliberately reckless with respect to her administration of [Apollo's] option granting process and her oversight of [Apollo's] accounting." *Id.* at ¶ 122. That is so, the FAC alleges because "contrary to the SOX certifications [which Gonzales signed] which each year affirmed the adequacy of [Apollo's] internal controls and the accuracy of [Apollo's] financial results, Gonzales wholly failed to monitor the granting of stock options, or account for the backdated stock options at Apollo." *Id.* at ¶ 125. These purportedly false SOX certifications, from plaintiff's viewpoint, "support a strong inference of scienter." Resp. (doc. 94) at 36. Two recent Ninth Circuit decisions substantially erode this argument, however.

Fairly recently, for the first time the Ninth Circuit addressed "the precise interplay between the reporting requirements of [SOX] and the scienter pleading requirements of the PSLRA." *Glazer Capital,* 549 F.3d at 747. Agreeing "with the reasoning of the Eleventh and Fifth Circuits[,]" the Court held that "[b]ecause Congress expressed no intent to alter the pleading requirement of the PSRLA, [SOX] certification is only probative of scienter if the person signing the certification is severely reckless in certifying the accuracy of the financial statements." *Id.* (internal quotation marks and citation omitted). In *Glazer Capital,* the plaintiff relied upon standard SOX certification language as to disclosure controls and procedures—the precise language upon which the plaintiff in this action also relies. However, because the plaintiff in *Glazer Capital* did not plead any "facts to th[e] effect" that defendants were "severely reckless," the Court held that "without

more," the SOX certifications "[we]re not sufficient ... to raise a strong inference of scienter[.]" *Id.*

■ As in *Glazer Capital,* plaintiff does not allege any facts showing that either Nelson or Gonzales was "severely reckless in certifying the accuracy of the financial statements." *See id.* Moreover, as in *Zucco,* plaintiff is relying upon nothing more than "boilerplate language" in Apollo's 10–K forms and statutorily required SOX certifications to establish scienter. *Zucco,* 552 F.3d, at 1003. In fact, in all significant respects, the SOX certification allegations herein are identical to those under scrutiny in *Zucco*—allegations which the Ninth Circuit found "add[ed] nothing substantial to the scienter calculus." *Id.* at 1004. In light of the foregoing, standing alone the purported false SOX certification allegations do not support a strong inference of scienter as to defendants Nelson and Gonzales, and certainly not to any of the other defendants.

**(c) Resignations**

■ Plaintiff believes that "[t]he mass exodus of Apollo executives and directors around the time that the allegations of backdating were revealed also supports an inference of scienter." Resp. (doc. 94) at 39. Plaintiff recognizes that such allegations are "not dispositive alone[ ]" of scienter. *Id.* Plaintiff reasons though that the "large number of resignations and firings," which it attributes to "Apollo's stock option misconduct and subsequent investigation," along with the "connections" of the departing individuals to "wrongdoing at Apollo," "collectively[ ] support a strong inference of scienter." *Id.* at 43.

Consistent with their prior proposition, Defendants assert that standing alone such allegations do not raise a strong inference of scienter, adding that resignations are an expected byproduct of a restatement. To

further undercut plaintiff's scienter argument on this point, defendants explain that the circumstances under which certain defendants left Apollo militate against a finding of scienter.

In *Zucco*, the Ninth Circuit also recently considered how resignations impact the scienter equation, indicating that "in some circumstances" they "may be indicative of scienter[.]" *Zucco*, 552 F.3d at 1002. However, "[w]here a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Id.* (citation omitted). The mere allegation that the company's independent accounting firm resigned one month after issuance of the restatement did not satisfy that pleading burden, the Court held in *Zucco*. That resignation was "not surprising[,]" in the Ninth Circuit's estimation, because that firm "had just been partially responsible for the corporation's failure to adequately control its accounting procedures." *Id.* That, the Ninth Circuit held, "is not enough to support a strong inference of scienter." *Id.*

"For other resignations occurring during the relevant period," but not necessarily in close proximity to the restatement, the Court in *Zucco* explained that "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Id.* "Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Id.* (citations omitted). In that context, additional allegations that "the resignation at issue was uncharacteristic when compared with defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances[ ]" are necessary. *Id.* Without such allegations, the Ninth Circuit held that "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will *never* be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.* (emphasis added).

Applying those principles to the record before it, the *Zucco* Court held that "the bare fact" that the defendant's chief financial officer ("CFO") retired "just prior to the disclosure of [defendant's] improper accounting and lack of financial controls during his tenure[ ]" did not support plaintiff's allegations of scienter where the complaint did not "indicate whether [that CFO] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure." *Id.* Likewise, allegations that two controllers resigned during the class period were insufficient "absent particular facts about [defendant's] hiring and firing of controllers during the class period, to create a compelling inference of scienter." *Id.* Plaintiff's claim that the controllers "left because they believed management was unethical[ ]" were "based on vague hearsay allegations[,]" the Ninth Circuit found, and hence were "not specific enough to extract a strong inference of scienter from otherwise mundane turnover in the corporation's financial department." *Id.*

Here, plaintiff alleges that two of the individual defendants, Mr. Blair, who wore several Apollo hats, serving as an Apollo director, a Compensation Committee member, and Chairman of the Audit Committee, as well as Ms. Govenar, another Apollo director, resigned in close proximity to the issuance of the Restatement. On May 2, 2007, they advised Apollo of their resigna-

tions, Morrison Decl'n (doc. 83), exh. 6 thereto at 3, and the Restatement was issued on May 22, 2007. As *Zucco* makes clear though, a strong inference of scienter requires more than close proximity between a restatement and a resignation.

As to defendant Blair, in its opposition plaintiff points to the allegation that he, along with defendant Norton "had the closest working relationship with Nelson at Apollo." Resp. (doc. 94) at 42 (internal quotation marks and citation omitted). That "working relationship" purportedly "consisted of massive systemic stock option misconduct at Apollo." *Id.* (internal quotation marks and citation omitted). These resignation allegations alone do not suffice to raise a strong inference of scienter as to Blair though because, as in *Zucco,* these facts are insufficient to "refut[e] the reasonable assumption that [his] resignation occurred as a result of [the] restatement's issuance itself[.]" *See Zucco,* 552 F.3d at 1002.

Further, because the resignations of Blair and Govenar "were not accompanied by any public statement by [Apollo] that [they] participated in or were involved in the fraud[,]" their resignations are "minimal evidence of scienter[.]" *See Rectifier,* 2008 WL 4555794, at *16. Not only that, but after resigning, defendant Blair continued to serve on the Board of Western International University, a wholly-owned subsidiary of Apollo, Morrison Decl'n (doc. 83), exh. 6 thereto at 3. That continued service further undermines a strong inference of scienter as to him. *See In re Cyberonics Inc. Sec. Litig.,* 523 F.Supp.2d 547, 553–54 (S.D.Tex.2007) (retention of CFO by company after supposedly "forced resignation," among other reasons, did not support strong inference of scienter), *aff'd on other grounds without pub'd opinion,* 292 Fed.Appx. 311 (5th Cir.2008). By the same token though, as discussed herein, because the FAC contains additional alle-

gations of Blair's "wrongdoing[,]" his resignation lends credence to a finding of scienter here. *See Rectifier,* 2008 WL 4555794, at *16 (citations omitted) ("A resignation or termination provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing.")

The FAC also does not include additional allegations as to defendant Govenar so as to support a strong inference of scienter based upon her resignation. Besides the fact of her resignation, plaintiff alleges only that Ms. Govenar was "removed from the Special Committee due to" an unspecified "conflict[ ] of interest[.]" Resp. (doc. 94) at 43 (citing FAC at ¶ 93). That generic allegation, simply is not enough to create a strong inference of scienter based upon Ms. Govenar's resignation. The FAC does not include allegations which would transform Ms. Govenar's resignation from a "benign" to a "suspicious" one.

Plaintiff also relies upon the resignations of four other defendants, Messrs. Nelson, Norton and Bachus, and Ms. Gonzales, to raise a strong inference of scienter. In contrast to defendants Blair and Govenar, none of these resignations were in close proximity to the Restatement—a fact plaintiff overlooks. "Apollo announced that [defendant] Nelson[,]" its Chairman, CEO and President, "unexpectedly 're-signed'" in January 2006—nearly a year and a half prior to issuance of the Restatement. FAC (doc. 71) at ¶ 19. The court will not turn a blind eye to the fact, however, that the Special Committee was formed that same month, on January 28, 2006. Nonetheless, without more, that timing does not raise a strong inference of scienter in terms of Nelson's resignation.

Plaintiff believes that the following allegation is "powerful evidence" of Nelson's scienter as it relates to his resignation:

John Sperling, ..., stated that he personally recommended that the Board terminate Nelson because 'he was preoccupied primarily with the stock price and not with the function of the company.'

FAC (doc. 71) at ¶ 19. Nowhere in the FAC, however, are there allegations as to Apollo's "typical hiring and termination patterns[,]" as *Zucco* demands. *See Zucco*, 552 F.3d at 1002. Nor does this allegation amount to a "suspicious circumstance[ ]" so as to support a strong inference of scienter. *See id.* Rather John Sperling's purported statement falls into the category of a "vague hearsay" allegation which, as in *Zucco* is "not specific enough to extract a strong inference of scienter[.]" *See id.* Clearly then, Nelson's resignation standing alone is insufficient to create a strong inference of scienter. Taking the mandatory holistic approach, however, as will soon become evident, the totality of the allegations as to defendant Nelson shows that plaintiff has sufficiently plead scienter as to him.

The FAC alleges that defendant Gonzales, Apollo's CFO, Secretary and Treasurer, was "forced to resign in November 2006 because of her involvement in the stock option backdating at Apollo." FAC (doc. 71) at ¶ 20. The FAC further alleges that as part of its "[c]ontinuing ... attempts to conceal ... backdating[,]" defendant Mueller "stated ... that Gonzales resigned to spend more time with her family." *Id.* at ¶ 99 (internal quotation marks omitted). Again, because her resignation was not in close proximity to the Restatement, and because there are no allegations as to Apollo's typical hiring and termination patterns or allegations of "suspicious circumstances[,]" in accordance with *Zucco*, the lone inference that Apollo "forced" Gonzales "to resign because of its knowledge of [her] role in the fraudulent representations will *never* be as cogent or as compelling as the inference that [she] resigned ... for unrelated personal or business reasons." *See Zucco*, 552 F.3d at 1002 (emphasis added).

Plaintiff attempts to show that Gonzales' resignation is highly probative of her state of mind based on allegations that the Special Committee "determined that [she] was unaware of APB 25, and therefore, administered an option plan that did not meet [certain IRS standards][,]" and she thus "[h]elped to cause" the financials to be restated, and necessitated IRS refunds because the options were not in compliance with APB 25. *See* FAC (doc. 71) at ¶ 125 (internal quotation marks and citation omitted). Plaintiff's reliance upon those determinations is misplaced because it is just as plausible to infer from Ms. Gonzales' supposed "unaware[ness] of APB 25" that she was "either negligent or grossly negligent—neither of which are sufficient under the PSLRA and Ninth Circuit precedent." *See Middlesex*, 527 F.Supp.2d at 1187. Consequently, like defendant Nelson, Gonzales' resignation without more does not establish the requisite strong inference of scienter. Also as with defendant Nelson, however, as will be more fully explained below, collectively viewing the allegations against Ms. Gonzales creates a strong inference of scienter so as to defeat dismissal.

Plaintiff barely mentions Bachus in its discussion of resignations, noting simply that he left at the same time as Gonzales—in November 2006. *See* Resp. (doc. 94) at 41 (citing FAC at ¶¶ 20–21). Such a conclusory allegation falls woefully short of the allegations necessary to support a strong inference of scienter based upon a resignation, especially given that Bachus' resignation preceded the Restatement by almost a year and a half. An independent perusal of the FAC reveals additional allegations as to Bachus' resignation, however.

Allegedly "he was forced to resign because of his involvement in the stock option backdating at Apollo." FAC (doc. 71) at ¶ 21. Furthermore, Bachus purportedly resigned before John "Sperling had a chance to ask for [his] resignation." *Id.* at ¶ 102. At the risk of repetition, the FAC does not include any allegations as to Apollo's typical hiring and termination practices. Although Bachus did resign during the Special Committee's investigation, that does not rise to the level of a "suspicious" circumstance. Absent such allegations, "the inference that [Apollo] forced certain employees[,]" such as Bachus, its former CAO and Controller, "to resign because of [its] knowledge of [his] role in the fraudulent representations will never be as cogent or compelling as the inference that [he] resigned ... for unrelated personal or business reasons." *See Zucco,* 552 F.3d at 1002. Thus, Bachus' resignation on its own is insufficient to establish a strong inference of scienter as to him.

The FAC is similarly flawed with respect to the allegations surrounding defendant Norton's resignation. The only allegation in the prolix FAC directly pertaining to his resignation alleges that he along with other defendants " 'retired' during or shortly after the Special Committee's investigation regarding options backdating and the issuance of [Apollo's] Restatement." FAC (doc. 71) at ¶ 137. The press release announcing his resignation as Compensation Committee Chair, effective December 8, 2006 (well before the Restatement), indicates that Mr. Norton's "intention [was] not to stand for reelection at [Apollo's] Annual Meeting[,]" which "generally occurs in January, 2007." Morrison Decl'n (doc. 83), exh. 4 thereto. But, "[i]n light of the fact that the meeting has not been scheduled, Mr. Norton preferred not to continue his term into 2007." *Id.* Based upon the foregoing, undoubtedly, the FAC does not include sufficient additional information so as to render defendant Norton's resignation suspicious as opposed to benign. Accordingly, without more, his resignation does not support a finding of scienter. As with several of the other defendants, however, as will be seen, viewing the totality of the scienter allegations as to Mr. Norton shows that the FAC does adequately allege scienter as to him.

### (d) Financial Gain

■ Next, plaintiff claims that the individual defendants' "personal enrichment through lucrative stock option grants and insider trading" is another possible means of establishing scienter. FAC (doc. 71) at 79(C); *see also id.* at ¶ 113(c) ("Additional facts provide actual and strong circumstantial evidence of defendants' scienter including ... [their] desire to personally obtain greater compensation without public scrutiny[.]"). Essentially defendants assert that the FAC does not include any of the details which are necessary to support an inference of scienter predicated upon financial gain.

■ In this Circuit "unusual or suspicious stock sales by corporate insiders *may* constitute circumstantial evidence of scienter[.]" *Zucco,* 552 F.3d at 1005 (internal quotation marks and citations omitted) (emphasis added). "[I]nsider trading is suspicious[,]" however, "only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (internal quotation marks and citations omitted). There are three factors that a court "must ... consider[ ] to determine whether stock sales raise a strong inference of deliberate recklessness[.]" *Id.* Those factors are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

(internal quotation marks and citation omitted). An examination of the FAC in light of these factors shows that due to the inadequacy of plaintiff's allegations of insider trading, even in combination, these three sub-factors are insufficient, standing alone, to establish an inference of scienter.

### (i) Amount and Percentage

"Typically, courts consider the percentage of shares sold to determine whether insiders are taking advantage of insider knowledge regarding a scheme that will artificially inflate the company's price." *Middlesex*, 527 F.Supp.2d at 1185 (citation omitted). In the context of an alleged scheme to improperly backdate stock options, however, the court in *Middlesex* found that plaintiff's failure to plead what percentage of each defendant's stock was sold to be "without consequence." *Id.* at 1186. In contrast to the "prototypical" insider trading scenario, the alleged backdating scheme in *Middlesex* "took place over several years[.]" *Id.* at 1185. Thus the court explained that "there was no reason for Defendants to quickly sell large percentages of their shares." *Id.* The court further contrasted "insiders ... who know that the then-inside information will eventually be disclosed to the public, resulting in a drop in the stock price, ... thus, requiring them to sell large portions of stock to maximize their profit," with backdating where it is "not inevitable that the improperly-dated stock options w[ill] be revealed." *Id.* Given that distinction, the *Middlesex* court found that "the requirement that percentages be pled is only relevant when the insider is aware of the time that the inside information will be disclosed and there will be a resulting effect on the stock price." *Id.* Accordingly, "[b]ecause Plaintiff ... pled the amount of stock sales with the appropriate degree of specificity, and the amount [wa]s substantial enough to justify an inference of motive," the *Middlesex* court held that this sub-factor "lean[ed] in favor of finding this stock sales 'suspicious.'" *Id.* at 1186.

Here, the FAC, and especially exhibit G thereto, provide the dates, number of shares, price and proceeds for each of defendants' stock sales, but no allegations as to what percentage of each defendant's shares were sold. Nonetheless, in the context of the backdating scheme alleged herein, this court finds convincing the *Middlesex* rationale set forth above. Hence, it agrees that plaintiff's failure to plead percentages of stock sold is inconsequential at this time. That is so because the FAC includes the necessary specificity as to defendants' stock sales, and the amount of those sales is substantial, viewed strictly in terms of amounts, in that allegedly proceeds ranged from $1,715,237 to $472,463,500. *See* FAC (doc. 71), exh. G thereto.

Unlike the court in *Middlesex*, however, this court is unwilling to take the next step and find that the foregoing "is substantial enough to justify an inference of motive[,]" and in turn a finding that defendants' stock sales were "suspicious." *See Middlesex*, 527 F.Supp.2d at 1186. The court is unwilling to find that the stock sales at issue herein are suspicious based only on the proceeds because plaintiff has "selected an unusually long class period of over [250] weeks." *See Brodsky v. Yahoo! Inc.*, 592 F.Supp.2d 1192, 1205 (N.D.Cal.2008) (citing *Vantive*, 283 F.3d at 1092 ("plaintiffs have selected an unusually long class period of [63] weeks")). "Just as in *Vantive*, 'lengthening the class period has allowed plaintiff[ ] to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period.'" *Id.* (quoting *Vantive*, 283 F.3d at 1092). "Thus, 'by themselves, large numbers do not necessarily create a strong inference of fraud.'" *Id.* (quoting

*Vantive,* 283 F.3d at 1093). In sum, although the lack of percentage allegations is not critical, the court cannot ignore the "unusually long class period" here in terms of the amounts sold and the proceeds. Thus, the court finds that the first sub-factor regarding insider trading does not weigh in favor of a finding that defendants' stock sales were suspicious.

### (ii) Timing

The FAC includes details as to when certain defendants received allegedly back-dated Apollo stock options. *See* FAC (doc. 71) at ¶¶ 49–52. However, as the individual defendants stress, the FAC does not allege, nor have plaintiffs "*attempt[ed]* to demonstrate that the **timing** of any Defendant's sales was suspicious." Supp. Br. (doc. 100) at 5 (emphasis in original). This omission is readily explainable from defendants' standpoint because the alleged stock sales, even the most recent one of December 30, 2005, occurred "*before* backdating was even an issue in corporate America[,]" and "*before* Apollo disclosed that it may have to restate its financial results." Mot. (doc. 82) at 21. Given the lack of temporal proximity both in terms of the timing of the stock sales themselves and in relation to the alleged misconduct, the individual defendants maintain that these sales were "not suspicious at all." *Id.* at 20.

"Traditionally," the timing factor "is not only concerned with the date on which the insider's shares were sold, but rather when the shares were sold in relation to the revelation of the inside-information." *Middlesex,* 527 F.Supp.2d at 1186 (citation omitted). In a backdating situation though, where there is "no preordained date on which the allegations of [such] w[ill] be revealed with [a] resulting drop in stock price[,]" the court again concurs with the *Middlesex* court—"[t]he facts ... do not lend themselves to analysis under this factor[.]" *See id.* In the first place, unlike the prototypical insider scenario, "here

defendants were not aware of the date on which [Apollo's] backdating practice would be revealed." *See id.* Plainly then, their "stock sales will not [necessarily] reflect large sales prior to disclosure." *See id.* Second, a backdating scheme, in contrast to the prototypical insider scenario, "does not depend on timing; regardless of when the stock is sold, the fact that the stock was granted at such a relatively low price virtually guarantees Defendants will reap significant profits." *Id.*

Further, reasoned the *Middlesex* court, the nature of backdating places defendants in a classic "catch–22[ ]" in that selling shortly after reports of backdating "cause[s] a strong appearance of impropriety[,]" whereas waiting to sell until after disclosure forces defendant to sell after the decline in stock prices. *Id.* For these reasons, in *Middlesex* the court found that plaintiff's failure to plead facts as to the timing of defendants' stock sales was "of little significance[.]" *Id.* Consistent with that view, the court further held that that timing sub-factor "neither weigh[ed] for nor against a finding of suspicious stock sales." *Id.*

The *Middlesex* rationale applies with equal force to the alleged backdating scheme at Apollo. Accordingly, this court, too, finds that although the FAC does not include allegations as to the timing of defendants' stock sales, that sub-factor does not figure in the court's final determination as to whether plaintiff's insider trading allegations are sufficient to support a finding of scienter.

### (iii) Prior Trading History

In *Zucco,* the Ninth Circuit repeated that "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiff must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zuc-*

*co,* 552 F.3d at 1005 (internal quotation marks and citation omitted). The Court in *Zucco* did not equivocate as to the necessity of such a comparison, stating that "[e]ven if the defendants' trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history." *Id.* (citations omitted). Thus, in *Zucco* the Ninth Circuit held that although the stock sales of two defendant officers were "significant," because the complaint did not include any allegations that their stock sales were "inconsistent" with their "usual trading patterns, no inference of scienter c[ould] be gleaned from [plaintiff's] stock sale assertions." *Id.* at 1006.

The same is true here. Missing from the FAC are any allegations as to the trading history of the ten individual defendants whom allegedly engaged in insider trading.[11] Plaintiff seeks to circumvent this requirement by noting, as the FAC alleges, that " '[s]ince this fraudulent scheme had commenced by at least 1998, no meaningful comparison of prior trading patterns can be performed.' " Resp. (doc. 94) at 46 (quoting FAC at ¶ 134). Therefore, allegations of defendants' trading history are not necessary.

To support that argument, plaintiff relies upon *Middlesex,* where the court found "persuasive" plaintiff's argument "that because Defendants were backdating options during the *entire* pre-Class Period, the fact that Plaintiff ha[d] not demonstrated that the sales were consistent with Defendants' prior trading history [wa]s effectively meaningless as there [wa]s no trading period without the influence of backdated options with which to compare the sales." *Middlesex,* 527 F.Supp.2d at 1187 (emphasis in original). What plaintiff overlooks, however, is that in the end,

given the lack of trading history, the *Middlesex* court found that factor "neither weighs for nor against a finding of suspicious stock sales." *See id.* Moreover, this court is not at liberty to disregard the Ninth Circuit's clear-cut directive in *Zucco* quoted earlier: "Even if the defendants' trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is *not* excused from pleading the relevant history." *Zucco,* 552 F.3d at 1005 (citation omitted) (emphasis added). Thus, as with the amount of shares sold, the lack of allegations as to defendants' trading history weighs against finding that their stock sales were suspicious. In sum, because two of the three stock sales subfactors weigh against a finding that those sales were suspicious, and the third, timing, does not come into play here, the court finds that even in combination, these three factors are insufficient, standing alone, to create a strong inference of scienter based upon alleged insider trading.

### (e) Motive

Closely related to plaintiff's insider trader allegations are its allegations that defendants had financial motives to backdate stock options, which plaintiff also believes is indicative of scienter. Succinctly put, the FAC alleges that "[d]efendants were motivated to commit the fraudulent scheme [of backdating] to reap significant personal profits." FAC (doc. 71) at ¶¶ 133 and ¶ 113(c). That motivation allegedly derived from "the fact that the vast majority of [defendants'] overall compensation was through stock option grants." *Id.* at ¶ 134. Additionally, supposedly defendants were motivated "to falsify [Apollo's] financial statement by failing to record the additional compensation expenses in order

---

**11.** There are no allegations that the eleventh individual defendant, Brian Mueller, engaged

in insider trading.

to meet their projected earnings goals and receive lucrative bonus[es][.]" *Id.*

Interestingly, plaintiff did not directly respond to defendants' valid argument that "motive and opportunity" alone, and likewise "the desire to maintain profitability" [12] alone, do not show scienter. *See, e.g., Cornerstone,* 355 F.Supp.2d at 1091 (and cases cited therein) ("The Ninth Circuit has clearly held that incentives to enhance business prospects and executive compensation incentives are insufficient allegations of scienter.") In accordance with this well-settled precedent, the court easily finds that the scant motive allegations are insufficient alone to carry plaintiff's burden of alleging scienter.

As should be evident by now, when viewed individually, plaintiff's scienter allegations are lacking. Therefore, in accordance with *Zucco,* the court "will conduct a 'holistic' review of the[se] same allegations to determine whether the[y] combine to create a strong inference of intentional conduct or deliberate recklessness." *See Zucco,* 552 F.3d at 992.

### d. Holistic View of Scienter Allegations

■ Defendants took the first step in the *Zucco* dual inquiry by viewing each scienter allegation in isolation, and then concluding those allegations do not sufficiently allege scienter. Defendants did not take the second and, as it turns out, critical step under *Zucco*—a holistic consideration of those individual allegations. When the court does that, although it finds that even when read together the allegations in the FAC do not create a strong inference of scienter as to some of the defendants, the FAC does sufficiently allege scienter as to others.

Even collectively, the allegations do not create a strong inference of scienter as to

defendants Bachus and or Govenar. The allegations as to defendant Bachus are relatively minimal. He was Apollo's Chief Accounting Officer and Controller from August 2000 until his resignation in November 2006, which allegedly was "forced" due to his "involvement in ... backdating[.]" FAC (doc. 71) at ¶¶ 11; 21; and 102. The FAC further alleges a one-time receipt of stock option grants as to Mr. Bachus. *Id.* at ¶ 52. In contrast to some of the other defendants whom the court will discuss below, the FAC does not include any particularized facts outlining Bachus' alleged involvement in backdating stock options. There is just the bald and factually unsubstantiated allegation that he was involved in backdating. Bachus' resignation, even when coupled with his stock sales and receipt of stock option grants does not create a "malicious inference" which "is at least as compelling as any opposing innocent inference." *See Zucco,* 552 F.3d at 991 (citations omitted). Thus, the court finds that plaintiff has not sufficiently alleged scienter as to Mr. Bachus. Accordingly, it grants his motion to dismiss the § 10(b) & Rule 10b–5 claims as against him.

The FAC is similarly bereft of allegations that Ms. Govenar acted with the requisite intent. The FAC merely alleges that she served on the Special Committee; later resigned; and sold Apollo stock. FAC (doc. 71) at ¶¶ 11; 24; and 93. The FAC does not allege that Ms. Govenar herself ever received stock options; and perhaps more importantly, it does not allege that she had any role at all in the stock option granting or accounting process. Without such allegations it is readily apparent that plaintiff has not "plead with particularity facts that give rise to a ... powerful or cogent ... inference" of scienter. *See Tellabs,* 551 U.S. at 324, 127 S.Ct.

**12.** Mot. (doc. 82) at 22.

at 2510 (citations omitted). Hence, the court grants defendant Govenar's motion to dismiss the § 10(b) and Rule 10b–5 claims against her.

On the other hand, holistically viewing the allegations of scienter as to defendants Nelson, Blair, Norton, and Gonzales persuades the court that plaintiff has sufficiently alleged scienter as to each of them. The primary although not only difference between these four defendants and Mr. Bachus and Ms. Govenar is that the FAC contains allegations as to their responsibility for, and rather extensive involvement with, the stock option granting and accounting processes. As set forth below, "[e]ach of these defendants is alleged to have participated in several different activities[,]" pertaining to option granting and the accounting thereof, which taken together "evidenc[e] scienter." *See In re Asyst Technologies, Inc. Deriv. Litig.*, 2008 WL 4891220, at *11 (N.D.Cal.2008) (citing cases).

To be sure, "[i]n the options backdating context, allegations that a defendant holds a high executive position," such as Nelson, former Apollo CEO, and Gonzales, Apollo's former CFO, Secretary and Treasurer, "without more do not support a strong inference of scienter." *See id.* (internal quotation marks and citations omitted). But, "allegations that the defendant signed false financial documents, approved options grants, oversaw the options granting process, or was intimately involved in deciding when and to whom options would be granted may support a strong inference of scienter." *Id.* (internal quotation marks and citations omitted); *see also Juniper*, 542 F.Supp.2d at 1047–48 (allegations that CEO and CFO received sizeable backdated stock options; issued and signed false securities filings; knew of or recklessly disregarded backdating; signed false financial documents knowing they were false or recklessly not knowing they were false; and who were in positions to oversee stock options such that they were in a position to know or were reckless in not knowing that options were inconsistent with financial statements supported strong inference of scienter).

The FAC alleges that defendant Nelson engaged in not just one of the activities listed above, but in all of them and more. In particular, allegedly he: (1) received backdated stock options; (2) signed "false and misleading" Forms 10–K and 10–Q; signed false SOX certifications "attest[ing] to the adequacy of [Apollo's] internal controls, and the accuracy of [Apollo']s reported financial statements[;]" falsely certified 10–K forms; and was an integral part of the option granting process, including "generally select[ing] the grant date[,]" hence acquiring knowledge of the option granting process. *See, e.g.*, FAC (doc. 71) at ¶¶ 19, 58, 64, 117(a)-(e), 119, 120, and 199, and exh. G thereto. The FAC further alleges that Nelson profited from insider trading by selling shares of Apollo stocks resulting in proceeds of $82,789,312. *Id.* Exh. 6 thereto. It further alleges that Nelson resigned as Apollo's CEO in January 2006, less than a month after the Apollo's 8–K indicated that the "Special Committee ... reported that certain former officers took steps that may have been intended to mask failures in the grant approval process with respect to [Apollo's] financial reporting and payment of taxes." *Id.* at ¶¶ 19 and 104; and exh. G thereto. Additionally, the FAC alleges that backdating violated Apollo's own stock option plans. *Id.* at ¶ 6. Lastly, the FAC alleges that ultimately Apollo was forced to issue a Restatement, the overall impact which was that a downward adjustment of its "retained earnings as of September 1, 2003" by approximately $62.5 million dollars. Morrison Decl'n (doc. 83), exh. 1 thereto at 15.

Viewing plaintiff's allegations together, although the inference of scienter as to defendant Nelson may not be of the "smoking gun genre," it does not need to be. *See Tellabs,* 551 U.S. at 324, 127 S.Ct. at 2510 (internal quotation marks and citation omitted). The inference is certainly enough, however, to defeat these motions to dismiss in that "the malicious inference is at least as compelling as any opposing innocent inference[,]" such as an innocent bookkeeping error. *See Zucco,* 552 F.3d at 991 (citations omitted). Put differently, the totality of these allegations supports a finding that plaintiff has adequately pled that defendant Nelson "either knew of the backdating, or w[as] deliberately reckless in not knowing of the backdating." *See Middlesex,* 527 F.Supp.2d at 1182. Thus, the court denies defendant Nelson's motion to dismiss to the extent it is based upon failure to adequately plead scienter.

For similar although not identical reasons, the court denies defendant Gonzales' motion to dismiss on scienter grounds. Gonzales attempts to minimize her alleged responsibility for backdating by selectively noting only the allegations of her "accounting position[ ]" and her resignation in November 2006. Mot. (doc. 82) at 11 (citations omitted). The FAC alleges much more than that though. It alleges that like defendant Nelson, Gonzales, Apollo's former CFO, received stock options; profited from the sale of Apollo stock in the amount of $5,257,858; knowingly signed false SOX certifications, attesting to the adequacy of Apollo's internal controls and the accuracy of its financial results; and also signed "false and misleading" Form 10–Ks. FAC (doc. 71) at ¶¶ 11, 20, 49–52, 58, 64, 99, 124. Furthermore, the FAC alleges that Ms. Gonzales "was at least deliberately reckless with respect to the options granting process at Apollo because, contrary to the SOX certifications ..., [she] wholly failed to monitor the granting of stock options, or account for the backdated stock options at Apollo." *Id.* at ¶¶ 125. These allegations, along with Ms. Gonzales' supposed unawareness of APB 25, taken together meet the threshold pleading requirements for scienter. This is all the more so in light of recent Ninth Circuit pronouncements, set forth earlier, that "[v]ague or ambiguous allegations are now properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Zucco* 552 F.3d at 1006, *South Ferry,* 542 F.3d at 784.

Defendants Norton and Blair are not current or former Apollo officers. Norton did, however, serve as Chair of the Compensation Committee and he was a member of the Audit Committee. Defendant Blair served as Chair of the Audit Committee and also was a member of the Compensation Committee. Given their membership on the Compensation Committee, both of these defendants allegedly were an integral part of Apollo's grant process, as the Special Committee's investigation demonstrates. "[M]ost grant dates were selected at Board or Compensation Committee meetings[.] ... prior to August 2001[.]" FAC (doc. 71) at ¶ 115(b) (internal quotation marks omitted). "Under the LTIP and the [2000 Plan], only the Compensation Committee could approve grants to the Former CEO[,]" defendant Nelson. *Id.* at ¶ 115(f) (internal quotation marks omitted). "In many instances, the Approval Memorandum" for the option grants "was signed by only the Chairman of the Compensation Committee" [Norton] [;] and there was a "lack [of] evidence as to whether all of the grants were, in fact, approved by a majority of the members of [that] Committee." *Id.* at ¶ 115(e) (internal quotation marks omitted). There were also Approval Memorandum signed by the Compensation Committee as a whole. *See id.* at ¶ 117(c). The Compensation Com-

mittee minutes reflect that "typically ... option grants were discussed and approved[ ]" at meetings of that Committee. *Id.* at ¶ 117(e).

In light of the foregoing, it is apparent that defendant Norton's and Blair's respective positions on the Compensation Committee gave them detailed knowledge as to the option grant dates. The other allegations against them such as Blair's profits of slightly more than $3.5 million from insider trading, and Norton's profits of nearly $8.0 million, along with the allegations discussed in preceding sections, such as their resignations, individually might not suffice to plead scienter. Mindful of the Court's acknowledgment in *South Ferry,* that "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective[,]" the court finds that the allegations against defendants Norton and Blair give rise to the inference that at the very least they were deliberately reckless in not knowing of the backdating.

Based upon *In re Nash Finch Co. Sec. Litig.,* 323 F.Supp.2d 956 (D.Minn.2004), defendants strongly urge this court to find that "[j]ust as two plus two will never equal five, the[ ] allegations [in the FAC]— whether considered apart or together—do not add up to a strong inference of scienter." *See id.* at 964 (footnote omitted). While that is true with respect to defendants Bachus and Govenar, it is not true to defendants Nelson, Gonzales, Norton and Blair. The allegations against those four defendants, in sharp contrast to *Nash,* are neither "trivial [n]or irrelevant[.]" *See id.* Collectively the FAC's allegations as to defendants Nelson, Gonzales, Norton and Blair go far beyond the "collective minutia offered" in *Nash.* In short, the allegations as to these four defendants "create an inference greater than the sum of [their] parts," that they acted with knowledge or

at least were deliberately indifferent as to the falsity of their statements regarding accounting for stock-based compensation expenses and the existence of internal controls in that regard. *See Zucco,* 552 F.3d at 1006. That inference is "still ... at least as compelling as an alternative innocent explanation[,]" of innocent bookkeeping error or a simple failure to cross every "t" and dot every "i". *See id.* Consequently, the court denies the motion to dismiss for failure to adequately plead scienter by these four defendants. Likewise, it denies Apollo's motion to dismiss on that same basis because "[t]he scienter of the[se] individual defendants, as directors and officers of [Apollo] is imputed to [Apollo]." *See Batwin,* 2008 WL 2676364, at *15 n. 8 (citation omitted).

### e. Remaining Individual Defendants

 As did the parties, to this point the court has deliberately not addressed the remaining defendants—John and Peter Sperling, Brian Mueller, Dino DeConcini, and Laura Noone. As Apollo reads the FAC, plaintiff is asking the court to infer scienter based "merely" on the individual defendant's "corporate titles and responsibilities." Mot. (doc. 81) at 26. This amounts to impermissible "group pleading," according to Apollo. *Id.* "[T]he group pleading doctrine establishes a presumption, for purposes of drafting a complaint, that statements in group-published information such as prospectuses, registration statements, annual reports, or press releases are the collective work of those individuals with direct involvement in the day-to-day affairs of the company." *New Century, supra,* 588 F.Supp.2d at 1223 (internal quotation marks and citations omitted). It is possible to interpret the FAC as relying upon the group pleading doctrine, but plaintiff does not mention that doctrine anywhere in its response or supplemental memorandum. Presumably,

then, plaintiff is not invoking that doctrine. To the extent that plaintiff may be relying upon group pleading, however, the court adopts the thorough and well-reasoned analysis in *New Century, id.* at 1222–24, and "[j]oin[s] the majority of other courts in this Circuit, ... hold[ing] that group pleading is no longer viable under the PSLRA." *Id.* at 1224.[13]

Much like Apollo, the five defendants identified above, contend that plaintiff has not sufficiently pled scienter as to each of them because it "does no more than identify their positions at [Apollo] and allege that, based on their ... positions, they had access to information concerning [Apollo's] stock option plans." Mot. (Doc. 82) at 23 (citing FAC at ¶ 112). Such "tactics" are "never," these defendants broadly assert, "sufficient to plead knowledge of fraud." *Id.* (footnote omitted). Defendant Mueller seeks dismissal on that same ground. In addition, he asserts that plaintiff has not sufficiently pled scienter based solely upon two allegedly false statements which he made, and which will be discussed more fully below.

Retorting that it has "plead far more than fraud by job title[,]" plaintiff emphasizes "the essential roles that Nelson, Blair and Norton played in the granting and approval of backdated stock options at [Apollo]." Supp. Br. (doc. 101) at 4 (citation omitted). Significantly though, plaintiff does not mention any of the defendants discussed above. By its silence, the court assumes that plaintiff concedes that it has not adequately pled scienter as to those defendants. The court thus grants the motion to dismiss as to John and Peter Sperling, Brian Mueller, Dino DeConcini and Laura Noone.

Even without plaintiff's implicit concession that it has not adequately pled scienter as to the just named defendants, nonetheless, they are entitled to dismissal of the 10(b) claims. Dismissal is mandated because, as discussed below, the FAC is glaringly deficient in terms of scienter allegations as to any of these defendants.

Ordinarily, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to the fraud or other allegations supporting scienter." *South Ferry*, 542 F.3d at 784–85 (internal quotation marks and citation omitted). In *South Ferry*, the Ninth Circuit did "recognize two exceptions to th[at] general rule[.]" *Zucco*, 552 F.3d at 1000 (citing *South Ferry*, 542 F.3d at 785). "The first permits general allegations about 'management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements' to create a strong inference of scienter when these allegations are buttressed with 'detailed and specific allegations about management's exposure to factual information within the company.' " *Id.* (quoting *South Ferry*, 542 F.3d at 785). "To satisfy this standard," the Ninth Circuit has explained, "plaintiffs might include in their complaint specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database, ... a specific admission from a top executive

---

13. Of course, "the group pleading doctrine is not fatal to allegedly misleading statements in SEC filings signed by the Officer Defendants[.]" *New Century*, 588 F.Supp.2d at 1224 (citing *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061–62 (9th Cir.2000)).

Those defendants cannot, however, "be liable for the press releases, except to the extent that there are specific statements attributed to them, or the press releases are otherwise connected to them[.]" *Id.* (citation omitted).

that [w]e know exactly how much we have sold in the last hour around the world, . . . , or other particular details about the defendants' access to information within the company." *Id.* (internal quotation marks and citations omitted).

The *Zucco* complaint did not allege the necessary particularized details, although it did "include allegations that senior management . . . closely reviewed the accounting numbers generated [by the defendant company] each quarter . . ., and that top executives had several meetings in which they discussed quarterly inventory numbers[.]" *Id.* Those allegations, according to the Ninth Circuit, did "not support the inference that management was in a position to know that such data was being manipulated[ ]" because "[n]othing in the complaint suggest[ed] that [one of the company's officers] had access to the underlying information from which the accounting numbers were derived." *Id.*

"The second exception . . . permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management." *Id.* at 1001. Thus, "[w]here the defendants 'must have known' about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed." *Id.* (quoting *Berson,* 527 F.3d at 987–89). By the same token, in quite strong language, the Ninth Circuit has held that "reporting false information will only be indicative of scienter where the falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them." *Id.* (internal quotation marks and citations omitted).

*Berson* is an example of a case with such "prominent" facts. *Berson* fell "into the exceedingly rare category of cases in which the core operations inference, without more, [wa]s sufficient under the PSLRA." *South Ferry,* 542 F.3d at 785 n. 3. The "unusual circumstances" which led the *Berson* Court to find "that the defendant company's misrepresentation of the status of stop-work orders was enough to infer scienter" were the issuance of "four stop-work orders [which] . . . respectively halted between $10 and $15 million of work on the company's largest contract with one of its most important customers, halted $8 million of work, caused the company to reassign 50–75 employees, and required [Defendant] to complete massive volumes of paperwork." *Zucco,* 552 F.3d at 1001 (internal quotation marks and citation omitted).

Here, the allegations in the FAC are, in many respects, even weaker than those in *Zucco,* and nothing on the magnitude of those in *Berson.* The court thus has little difficulty finding that plaintiff cannot rely upon the core-operations inference to create a strong inference of scienter with respect to John and Peter Sperling, Laura Noone, and Brian Mueller.

Before separately considering the allegations as to these defendants, it should be noted that the FAC includes two paragraphs of what can best be described as "catch-all" scienter allegations against all defendants. *See* FAC (doc. 71) at ¶¶ 112–113. Particularly noteworthy at this point is the allegation that "defendants acted with scienter in that they . . . had access to all internal data concerning [Apollo's] stock option plans[.]" *Id.* at ¶ 112. The FAC does not indicate exactly how each of the defendants achieved that access and, perhaps more importantly, it does not allege the exact nature of that "internal data." In similarly broad language, the FAC further alleges that "[a]dditional facts provide actual and strong circumstantial evidence of defendants' scienter

including[,]" among other things, "defendants' roles, responsibilities, and specifically articulated duties for granting and administering grants[.]" *Id.* at ¶ 113. As will be more fully explained below, while this is an accurate allegation as to some of the defendants, it is not as to all of them.

As to Peter Sperling, the allegations in the FAC are few. He is Apollo's Senior Vice President and a director, and allegedly received backdated stock option grants. FAC (doc. 71) at ¶¶ 27; 49; and 51–52. Further, he, along with John Sperling, appointed the Special Committee. *Id.* at ¶ 93. Finally, Peter Sperling purportedly indicated that Ms. Gonzales resigned due to backdating, and that she was " 'unaware of APB 25.' " *Id.* at ¶¶ 99 and 127. Such allegations do not come close to meeting the standards recently explicated by the Ninth Circuit. There are no specific admissions of the type described in *South Ferry.* Nor does the FAC include any "details about [Peter Sperling's] access to information within [Apollo] [.]" *See Zucco,* 552 F.3d at 1001 (internal quotation marks and citation omitted).

Moreover, this is not an "exceedingly rare" case such as *Berson* where the "falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management[,]" such as Peter Sperling, "was unaware of them." *See Berson,* 527 F.3d at 989 (internal quotation marks and citation omitted). The allegedly false statements pertain, *inter alia,* to Apollo's misapplication of certain accounting principles, such as how it did or did not account for stock-based compensation expenses, and the existence of internal controls in that regard. Lastly, the FAC is devoid of any allegations that Peter Sperling had any role in granting stock options, accounting for them, or that he had any information as to the approval process for those grants. For all of these

reasons, the court grants his motion to dismiss the § 10(b) and Rule 10b–5 claims.

The FAC includes more detailed allegations as to John Sperling, but in the end those additional allegations are not enough to defeat dismissal of the § 10(b) and Rule 10b–5 claims. As with Peter Sperling, there are no allegations in the FAC as to John Sperling's role, if any, in the granting of or accounting for Apollo stock options. Further, there are no details as to his access to any Apollo information, much less his access to grant process or accounting information. Nor, as just explained in connection with Peter Sperling, does the FAC include allegations bringing it within either of the two exceptions to the "general rule that falsity alone cannot create a strong inference of scienter." *See Zucco,* 552 F.3d at 1001. Consequently, plaintiff cannot rely upon the core-operation inference to salvage its section 10(b) claims against John Sperling.

Defendant Laura Noone did not hold a management position at Apollo *per se,* but since September 2000, she has been President of the University of Phoenix, purportedly "Apollo's most important and well known subsidiary." *See* FAC (doc. 71) at ¶ 24. Arguably, therefore, assuming the allegations are otherwise sufficient, the core-operations inference may apply to create a strong inference of scienter as to her. However, the FAC does not contain the necessary allegations as to Ms. Noone. What the FAC does allege is that:

> Because of [her] position, [Noone] knew the adverse non-public information about the business of Apollo, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via re-

ports and other information provided to her in connection therewith.

*Id.* at ¶ 28.

This sweeping allegation is nothing more than a statement of Ms. Noone's "general awareness of the day-to-day workings of [Apollo's] business[,]" which the Ninth Circuit has repeatedly held cannot support a strong inference of scienter "absent some additional allegations of *specific* information conveyed to management and related to the fraud *or* other allegations supporting scienter." *See, e.g., South Ferry,* 542 F.3d at 784–85 (internal quotation marks and citation omitted) (emphasis added). Conspicuously absent from the FAC are any such particularized allegations. Besides the paragraph quoted above, the only other allegations in the FAC as to Ms. Noone are that she received stock option grants on three occasions. *See* FAC (doc. 71) at ¶¶ 49; and ¶¶ 51–52. Clearly these allegations do not create the requisite strong inference of scienter.

The expansive scienter allegations in paragraphs 112 and 113, quoted earlier, do not convince the court otherwise. *See, supra* at 88–89. The inference that Ms. Noone, University of Phoenix's President—not an Apollo director or manager—"would not have responsibility or control over the grant of employee stock options is significant[.]" *See Juniper,* 542 F.Supp.2d at 1048. In light of the foregoing, the court finds that plaintiff has not sufficiently alleged scienter as to defendant Noone.

Next the court turns to the allegations pertaining to defendant Mueller, Apollo's President since 2006, who served "in a variety of executive positions" with Apollo prior to that. FAC (doc. 71) at ¶ 128. In addition to relying upon his "executive" status at Apollo, the FAC alleges that "[f]rom at least June 2006, Muller issued a *series* of knowingly false statements regarding the backdating at Apollo[.]" *Id.* at ¶ 129 (emphasis added). Purportedly

those statements are "specifically designed to mislead Apollo's investors." *Id.* Close scrutiny of the FAC reveals, however, that it contains only two allegations that defendant Mueller made "knowingly false statements." The first is that Mueller allegedly stated that defendant Gonzales "resigned to 'spend more time with her family.'" *Id.* at ¶¶ 99 and 130. Plaintiff alleges that "[it] is simply inconceivable that Mueller, as President of Apollo, would not know why his CFO resigned." *Id.* at ¶ 130. The second is Mueller's purported statement on November 3, 2006, "that 'to date there has been no indication that there has been any backdating.'" *Id.* at ¶ 131.

Defendant Mueller's status as an Apollo executive of longstanding in a variety of capacities clearly is insufficient to support a strong inference of scienter as to him. Nor do his allegedly false statements just quoted support such an inference, especially given the complete absence of "particular details about [Mueller's] access to information within [Apollo]." *See Zucco,* 552 F.3d at 1000 (internal quotation marks and citations omitted). Thus, the court also finds the defendant Mueller is entitled to dismissal of the section 10–b claims as against him.

Defendant DeConcini stands in a slightly different position than the defendants just discussed in that he was not an Apollo officer; nor did he hold a management position there. It is thus questionable, in the first instance, whether the core-operation inference would apply to him.

Regardless, given the relatively *de minimis* nature of the allegations against them, it is readily apparent that plaintiff has not adequately pled scienter as to Mr. DeConcini. Mr. DeConcini's name appears in only two of the FAC's 200 paragraphs. At one point the FAC alleges that he has been an Apollo director since 1981, and an Audit Committee member. *Id.* at ¶ 26. Later in the FAC it generally alleg-

es his "responsib[ilities]" as a member of that Committee:

> (I) reviewing and discussing the audited financial statements of [Apollo] with management; (ii) discussing with [Apollo's] independent accountants the matters required to be discussed by the Statement of Accounting Standards ...; (iii) receiving and reviewing the written disclosures and letters from its independent accountants ...; (iv) discussing with its independent accountants, the independent accountants' independence; and (v) recommending to the Board ... that the audited financial statement be incorporated by reference into [Apollo's] Annual Reports.

*Id.* at ¶ 40. Reciting a laundry list of defendant DeConcini's alleged Audit Committee responsibilities does not create a strong inference of scienter, primarily because without more the inference that he "had knowledge of the relevant facts will not be much stronger, if at all, than the inference that [he] remained unaware." *See South Ferry,* 542 F.3d at 784. Hence, this generic allegation cannot save this otherwise deficient FAC in terms of Mr. DeConcini's scienter. There is nothing linking him to any aspect of stock option granting or the associated accounting. Accordingly, these meager allegations, even when viewed collectively under the rubric of *Tellabs* and its progeny, do not create a strong inference of scienter as to Mr. DeConcini. Thus, the court grants his motion to dismiss the section 10(b) claims.

Having found that the FAC sufficiently alleges scienter as to at least some of the defendants, the court will next turn to the adequacy of the loss causation allegations.

### 3. Loss Causation

### a. Pleading Standards

### I. Rule 8 v. Rule 9

Preliminarily, the court must address the parties' disagreement as to the pleading standard for loss causation. Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a)(2). In alleging "fraud or mistake," however, Rule 9(b) requires a party to "state *with particularity* the circumstances constituting [that] fraud or mistake." Fed.R.Civ.P. 9(b) (emphasis added). Plaintiff contends that Rule 8(a)(2)'s "short and plain statement" supplies the relevant pleading standard, whereas Apollo "suggests that the heightened pleading requirements of Fed.R.Civ.P. 9(b)" apply. Reply (doc. 97) at 17 (citations omitted).

Logically, loss causation is one of the "'circumstances constituting fraud for which Rule 9(b) demands particularity[]'" because without loss causation, there is no securities fraud claim. *See Teachers' Ret. Sys. of La. v. Hunter,* 477 F.3d 162, 186 (4th Cir.2007) (citing, *inter alia, Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 343–44, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)) (other citations omitted). Following that reasoning would require that loss causation be pled in conformity with Rule 9(b)'s particularity requirement.

Neither the Supreme Court nor the Ninth Circuit has definitively held that Rule 9(b) applies when pleading loss causation, however. Instead, the Supreme Court in *Dura* "assum[ed] at least for argument's sake, that neither the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further" pleading requirement, apart from Rule 8(a)(2), when pleading loss causation. *Dura Pharms.,* 544 U.S. at 346, 125 S.Ct. 1627. The *Dura* Court was able to sidestep that issue because the complaint there did not "provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus,

**814**

the *Dura* complaint "fail[ed]" the "simple test[ ]" of Rule 8(a)(2), which requires a " 'short and plain statement' " showing entitlement to relief. *Id.*

The Ninth Circuit in *Berson* purported "not to decide the question" of whether loss causation allegations are subject to Rule 8(a)(2) or Rule 9(b) pleading standards. *Berson,* 527 F.3d at 989. At the same time, though, the *Berson* Court made the opposite assumption from the Supreme Court in *Dura. Berson,* 527 F.3d at 989. Rather than assuming the applicability of Rule 8, the Ninth Circuit "[a]ssum[ed]— without deciding-that Rule 9(b) governs[.]" *Id.* Based upon that assumption, the *Berson* Court opined "that plaintiffs bringing a 10b–5 securities fraud claim must plead ... loss causation with particularity[.]" *Id.* The *Berson* plaintiffs met that standard "by alleging particular facts indicating that but for the circumstances that the fraud concealed ... [plaintiffs'] investment ... would not have lost its value." *Id.* (internal quotation marks and citations omitted). The *Berson* Court further reasoned that because the complaint there gave "defendants ample notice of plaintiffs' loss causation theory," as well as "giv[ing] some assurance" to the Court "that the theory has a basis in fact[,] ... Rule 9(b) require[d] no more." *Id.* at 989–990 (citations omitted).

More recently, in *Gilead,* the Ninth Circuit once again declined to decide whether Rule 8(a)(2) or Rule 9(b) controls loss causation pleading, holding that "under either Rule 8 or Rule 9, the Investors ha[d] sufficiently ple[d] loss causation." *See Gilead,* 536 F.3d at 1056. Plaintiffs alleged that Gilead, a biopharmaceutical company, misled investors by claiming that there was a high demand for one of its drugs without disclosing that unlawful off-label marketing caused that demand. In assessing the strength of the loss causation allegations in *Gilead,* the Court once again focused on

Rule 9(b)'s heightened pleading requirement.

The *Gilead* complaint met that standard because it was "meaningfully different" from the *Dura* complaint. *See id.* The *Dura* plaintiffs merely alleged that they "paid artificially inflated prices for Dura securities" and that they "suffered damage[s] thereby." *Dura Pharms.,* 544 U.S. at ——, 125 S.Ct. at 1630 (emphasis, quotation marks and citation omitted). In contrast, the *Gilead* complaint alleged a specific economic loss caused by Gilead's misrepresentations. Additionally, the *Gilead* plaintiffs "provide[d] abundant details of Gilead's off-label marketing, ... assert[ing] that th[at] lead to higher demand [for the drug], which in turn inflated Gilead's stock price." *Gilead,* 536 F.3d at 1056 (footnote omitted). These allegations allowed "the fraud-action defendant" to "prepare an adequate answer[,]" in accordance with Rule 9(b). *See id.* (internal quotation marks and citation omitted).

Although *Berson* and *Gilead* left open the issue of whether Rule 8 or Rule 9 governs loss causation pleading, the Ninth Circuit was clear on one point. A securities fraud complaint must, as the foregoing discussion shows, "offer sufficient detail to give defendants ample notice of [their] loss causation theory, and to give [the court] some assurance that the theory has a basis in fact." *Id.* (internal quotation marks and citation omitted). In other words, ample notice is the cornerstone of loss causation pleading. Here, as explained below, the FAC provides the requisite ample notice, but only as to one of the three alleged disclosures.

### ii. *Dura and its Progeny*

As the Ninth Circuit recently stressed, "[a] plaintiff does not, of course, need to *prove* loss causation in order to avoid dismissal; but the plaintiff must properly al-

lege it." *Metzler Inv.*, 540 F.3d at 1062 (citation omitted). Loss causation is simply the proximate cause element of a securities fraud claim. *Johnson v. Aljian*, 490 F.3d 778, 782 furthers the objectives of federal securities laws, which are designed "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms.*, 544 U.S. at 345, 125 S.Ct. at 1633.

In the seminal case of *Dura Pharmaceuticals*, the Supreme Court held that a plaintiff invoking the fraud-on-the-market theory must do more than simply plead an artificial inflation of a company's stock to satisfy the loss causation element of a securities fraud action. Such allegations do not suffice to plead loss causation because the link between an inflated share price and a subsequent economic loss "is not invariably strong." *Dura*, 544 U.S. at 342, 125 S.Ct. at 1632. To illustrate, the Court pointed out that if a share with an allegedly inflated price is later sold at a lower price, that lower price is not necessarily reflective of an alleged misrepresentation. That lower price could be due to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[,]" none of which may have any relation to the earlier misrepresentation. *See id.* at 343, 125 S.Ct. at 1632. Because the *Dura* plaintiffs did not attempt to link their damages to any defense conduct, the Supreme Court held that they did not sufficiently plead loss causation.

Recognizing that that requirement is "not meant to impose a great burden upon a plaintiff," nonetheless, the *Dura* Court requires a plaintiff to "provide [a] defendant with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]" *Id.* at 347, 125 S.Ct. at 1634. Allegations short of that "would bring about harm of the very sort the statues seek to avoid[,]" and "transform a private securities action into a partial downside insurance policy." *Id.* (citation omitted).

Shortly after *Dura*, in *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir.2005), the Ninth Circuit reversed the dismissal of plaintiff's complaint finding that they had sufficiently alleged loss causation. The *Daou* Court held that "[t]o establish loss causation, 'the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff.'" *Gilead*, 536 F.3d at 1055 (quoting *Daou*, 411 F.3d at 1025). In so holding, the *Daou* Court set forth two important principles. First, it explained that "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *Daou*, 411 F.3d at 1025 (internal quotation marks and citation omitted) (emphasis in original). However, the misrepresentation "must be a substantial cause ... for the decline in the value of the securities[.]" *Gilead*, 536 F.3d at 1055–56 (internal quotation marks and citation omitted). Other causes of decline are factored into any subsequent damages analysis. Therefore, so "long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining damages." *Daou*, 411 F.3d at 1025 (internal quotation marks and citation omitted).

Second, there is a temporal component to loss causation, which *Daou* illustrates. "[C]areful[ly] delineati[ng] between losses caused after the company's conduct was revealed, and losses suffered before the

revelation[,]" the *Daou* Court "confirm[ed] that the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market *and* caused the resulting losses." *Metzler Inv.*, 540 F.3d at 1063 (emphasis added). Plaintiffs' theory of fraud in *Daou* "was that the defendant was systematically recognizing revenue on contracts that had not been completed." *Id.* (citation omitted). The *Daou* Court held that plaintiffs adequately pled loss causation "because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Id.* (citations omitted).

The Ninth Circuit revisited the loss causation pleading requirements in a recent trilogy of cases, *Berson,* 527 F.3d 982; *Gilead,* 536 F.3d 1049; and *Metzler Inv.,* 540 F.3d 1049.[14] *Gilead* provides another example of the temporal component of loss causation. Allegedly Gilead illegally marketed one of its drugs, Viread, for off-label purposes. As a result of those aggressive off-label marketing tactics, plaintiffs further alleged that sales of Viread improperly increased, in turn driving Gilead's stock prices higher.

The Food and Drug Administration ("FDA") issued two warning letters informing Gilead that it was violating FDA regulations pertaining to off-label marketing. When one of the FDA letters became public on August 7, 2003, the market did not react negatively. Gilead challenged the sufficiency of plaintiffs' loss causation allegations given the absence of a market decline at that point.

Three months later though, on October 29, 2003, one day following Gilead's issuance of a press release explaining that Viread's sales volume was below expecta-tions, Gilead's stock fell 12%. The district court declined to "make the unreasonable inference that a public revelation on August 8 *caused* a price drop *three months later* on October 28." *Id.* at 1057 (internal quotation marks and citation omitted). In reversing, the Ninth Circuit held that the allegations of a "specific economic loss[ ]"—the October 29th stock price—coupled with allegations that that loss was caused by Gilead's misrepresentations, was sufficient to allege loss causation, despite the three month gap. *Id.* at 1056. Finding that "what truly motivated the dismissal was the district court's incredulity[,]" the Ninth Circuit admonished that such "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.*

Quoting from *Twombly,* the Ninth Circuit emphasized: " '[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.' " *Id.* at 1057 (quoting *Twombly,* 550 U.S. at ——, 127 S.Ct. at 1965) (internal quotation marks omitted). The loss causation element is "no exception to this rule[.]" *Id.* Indeed, the *Gilead* Court expressly "agree[d]" with the Third Circuit's view "that loss causation becomes most critical at the proof stage[;]" and noted that Circuit's "cit[ation] [to] scholarly authority stating that it is normally inappropriate to rule on loss causation at the pleading stage." *Id.* (internal quotation marks and citation omitted). Likewise, the *Gilead* Court expressly "agree[d]" with the Second Circuit "that loss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.* (internal quotation marks and citations omitted). According-

---

**14.** As ordered by this court, the parties provided "limited supplemental briefing ... on the issues of loss causation and scienter" as discussed in this trilogy. Doc. 99 at 1–2.

ly, "[s]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation," the Ninth Circuit opined that "a Rule 12(b)(6) dismissal is inappropriate." *Id.* Again quoting from *Twombly,* the Ninth Circuit pointed out that "[t]his is not 'a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *Id.* (quoting *Twombly,* 550 U.S. at ——, 127 S.Ct. at 1965). Thus, in *Gilead* a three month gap between the revelation of a misrepresentation and a drop in stock price did not necessarily foreclose the possibility that that earlier misrepresentation caused that later loss.

The temporal aspect of loss causation was not an issue in *Metzler Inv.,* decided just a few weeks after *Gilead.*[15] Rather, the *Metzler Inv.* Court held that simply alleging a risk of loss or misrepresentation without more does not satisfy the loss causation element of a securities fraud claim. There, the plaintiffs alleged that Corinthian Colleges artificially inflated its stock prices by (1) manipulating student enrollment figures, which it then used to fraudulently obtain federal funding; and (2) by improperly recognizing federal funding as income in violation of GAAP. Two public disclosures allegedly caused the company's stock to drop. The first was a June 24, 2004 "Financial Times" article disclosing a Department of Education investigation of enrollment irregularities at one of Corinthian's campuses. The second disclosure was an August 2, 2004, company press release announcing reduced earnings and an adjusted revenue forecast.

The Ninth Circuit found, however, that neither of those disclosures "disclosed—or even suggested to the market that Corint-

hian was manipulating student enrollment figures . . . which is the fraudulent activity that Metzlers contend[ed] forced down the stock that caused its losses." *Id.* at 1063. The Ninth Circuit reasoned that a plaintiff cannot be "allow[ed] . . . to plead loss causation through 'euphemism[,]' . . . thereby avoid[ing] alleging the necessary connection between defendant's fraud and the actual loss." *Id.* at 1064. The Court explained:

> So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price.

*Id.* (citation omitted). Instead, "[s]tated in the affirmative, the complaint must allege that the defendant's share price *fell significantly* after the truth became known." *Id.* at 1063 (internal quotation marks and citation omitted) (emphasis added). At a minimum, "[a] plaintiff's complaint must, . . ., set forth allegations that if assumed true, are sufficient to provide [the defendant] with *some indication* that the drop in [defendant's] stock price was causally related to [the defendant's] financial misstatement[s]." *Id.* at 1062 (internal quotation marks and citations omitted) (emphasis added). It is against this legal backdrop which the court will examine the three allegedly corrective disclosures at issue herein.

---

**15.** *Metzler* was originally decided on July 25, 2008, before *Gilead. See Metzler Inv. GmbH v. Corinthian Colleges, Inc.,* 534 F.3d 1068 (9th Cir.2008). On August 26, 2008, however-

er, the Ninth Circuit withdrew that earlier decision because it was superseded and amended by *Metzler Inv.,* 540 F.3d 1049.

### b. *Corrective Disclosures?*

The FAC alleges that throughout the Class Period defendants "issued a series of false and misleading" statements regarding Apollo's "financial results[ ]" and its stock option practices. FAC (doc. 71) at ¶ 53. Due to those alleged misstatements, the FAC further alleges Apollo's stock price was artificially inflated. Plaintiff's theory is that when the "truth" about those alleged misstatements became known to the market in three separate disclosures, it resulted in a decline in the price of Apollo's stock.

From Apollo's perspective, the "truth" was not revealed to the market, however, until May 22, 2007. On that date Apollo issued a Restatement correcting its prior misstatements regarding its stock option practices, and, for the first time, quantifying the financial impact of its accounting errors resulting therefrom. Apollo stresses that after that Restatement its stock value actually rose. Based upon this scenario, framed in terms of the standard applied in *Gilead*, Apollo contends the loss causation allegations are "facially implausible[,]" thus mandating dismissal. *See Gilead*, 536 F.3d at 1057. Plaintiff retorts that the FAC contains "extensive factual detail far beyond the required 'plausible' standard[,]" and thus it can withstand these dismissal motions. *See* Supp. Br. (doc. 101) at 6 (citations omitted).

"One way in which [a] plaintiff can prove [loss causation] is by showing that a corrective disclosure caused the stock price to decline." *In re Apollo Group, Inc. Sec. Litig.*, 2008 WL 3072731, at *2 (D.Ariz. Aug.4, 2008) (citations and footnote omitted). Succinctly put, "[a] 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market." *Id.* (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n. 4 (2nd Cir.2005)) (holding that, to be corrective, a disclosure must "reveal to the market the falsity of the prior [representations]"). It stands to reason then that "[a] disclosure that does not reveal anything new to the market is, by definition, not corrective." *Id.* (citing *Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 551 (S.D.N.Y.2008)).

As just shown, revelation of the fraud, or at some aspect of it, is critical in terms of assessing whether a given disclosure is corrective. Consequently, before examining the claimed corrective disclosures here, it is necessary to determine the fraudulent activity which the FAC alleges. The FAC alleges that Apollo engaged in three types of fraudulent activity. First, allegedly Apollo's "financial statements were false and misleading because they failed to account for stock option expenses[.]" Supp. Br. (doc. 101) at 10 (citing FAC, *e.g.*, ¶¶ 53 and 135). Second, the FAC alleges that Apollo falsely represented that it "account[ed] for its stock-based awards in accordance with [APB 25] [.]" *Id.* (citing FAC, *e.g.*, ¶¶ 46 and 53). The third alleged fraudulent activity is that "defendants signed false [SOX] . . . certifications . . . attest[ing] to the adequacy of Apollo's internal controls" pertaining to stock option grants. *Id.* (citing FAC, *e.g.*, ¶¶ 53 and 124).

As Apollo reads the FAC, plaintiff is attempting to plead loss causation based upon three supposed "corrective disclosures," which purportedly revealed the claimed fraudulent activities listed above. The first such disclosure is a June 8, 2006, report by Lehman Brothers (the "Lehman Report" or "the Report") questioning Apollo's stock option history. The second is a June 19, 2006, announcement that the U.S. Attorney for the Southern District of New York had issued a subpoena to Apollo requesting documents pertaining to its stock option grants. Third, plaintiff is relying upon an October 18, 2006, news re-

lease by Apollo regarding the identification of "various deficiencies in the process of granting and documenting stock options[.]" FAC (doc. 71) at ¶ 98 (emphasis omitted).

From Apollo's perspective, none of these disclosures are corrective. Taking the opposite view, believing that each of the three "either disclosed—or ... suggested that Apollo's prior statements were false[,]" plaintiff asserts that those disclosures are corrective. *See* Supp. Br. (doc. 101) at 15 (citation omitted). The court will separately examine each of these three disclosures to ascertain whether they are corrective in the first place.

#### i. Lehman Report

The FAC alleges that "[o]n June 8, 2006, ... an analyst at Lehman Brothers[ ] published a report titled, 'Did Apollo Backdate Options?'[.]" FAC (doc. 71) at ¶ 89. The FAC selectively quotes from one sentence in that nine page Report: " 'While it is impossible to tell definitively from a company's proxy and other SEC filing whether or not it is guilty of backdating, *Apollo['s] ... option grant history looks highly questionable....*' " *Id.* (emphasis added in FAC). The FAC also relies upon tables in that Report "showing that Apollo's option grant prices occurred" at what the FAC characterizes "almost miraculously at the lowest price of the year in 2000, 2001, 2002 and 2004." *Id.* The FAC goes on to allege that the same day as the Lehman Report, Apollo's stock price "fell 2.7%" from the previous day's closing price. *Id.*

Apollo strenuously contends that the Lehman Report "did not 'correct' Apollo's historical financial statements[,]" or "indicate" a need for their correction. Mot. (doc. 81) at 18. Hence, that Report is not a corrective disclosure which can form the basis for pleading loss causation.

Basically plaintiff responds that the Lehman Report "revealed, at least in part, the 'fraudulent activity' " which it is alleg-

ing, and that is all that *Dura* and its progeny require. Supp. Br. (doc. 101) at 14 (citation omitted). Although the FAC does not make this allegation, in its supplemental brief, plaintiff baldly asserts that the Lehman Report *"explicitly alerted the market* that Apollo had *very likely engaged* in *backdating,* and thereby *revealed* that its *prior statements* which failed to disclose or account for such backdating *may well have been false."* Supp. Br. (doc. 101) at 10 (emphasis added). This characterization, even if included in the FAC, does not comport with even the relatively minimal loss causation pleading standards of *Dura.* Moreover, plaintiff is overstating what the Lehman Report actually states.

Certainly the snippet which the FAC quotes does not substantiate the view that the Lehman Report "explicitly alerted [the market] that Apollo had very likely engaged in backdating[.]" *See id.* Indeed, a careful review of that entire Report demonstrates the fallacy in this assertion. Nowhere in the Lehman Report does it reveal any of the three types of fraudulent activity of which plaintiff complains, or even reveal some aspect of those allegedly fraudulent activities. Instead, much like one of the disclosures at issue in *Metzler Inv.,* at most, the Lehman Report "reveals a 'risk' or 'potential' for widespread fraudulent conduct." *See Metzler Inv.,* 540 F.3d at 1063 (emphases omitted). As the FAC itself highlights, the Lehman report stated that *"Apollo['s] ... option grant history looks highly questionable....*' " FAC (doc. 71) at ¶ 89 (emphasis added in FAC). Having a "questionable" grant history, even a "highly questionable grant history" is not equivalent to revealing a fraud, or at least some aspect of a fraud, however.

Again quoting from the Lehman Report, the FAC candidly acknowledges that "it is impossible to tell definitively from a company's proxy and other SEC filings wheth-

er or not it is guilty of backdating[.]" *Id.* The Lehman Report goes on to explain that it has **"taken a look at the history of the option grant prices ... as an *attempt to determine if any questionable activity exists."*** Farrell Decl'n (doc. 80), exh. B thereto at 2 (bold emphasis in original) (italicized emphasis added). The Report itself expressly "reiterated[d][,]" not once but twice "that it is *impossible* to tell *definitively* if a company has backdated options from the disclosure in its SEC finings [sic]." *Id.* at 2 and 4 (emphasis added). "[B]eliev[ing] the probability" to be "very small" that Apollo's option grant timing could be due to "either luck or excellent timing[,]" the Report twice opined that Apollo **"is highly susceptible to *future scrutiny* by either the press or the two government agencies who have been investigating and prosecuting other option backdating cases (the SEC and U.S. Attorney's Office)."** *Id.* at 4 (bold emphasis in original) (italicized emphasis added). The Lehman Report, therefore, cautioned "investors to tread lightly with [Apollo] shares at current levels." *Id.* None of these speculative observations, even had they all been included in the FAC, comport with the loss causation pleading requirements of *Dura* as recently elucidated by the Ninth Circuit, however. *See Metzler Inv.*, 540 F.3d at 1064 ("[Neither] *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct.")

As the foregoing demonstrates, the FAC's allegations do not, as they must, "confirm that the practices ... plaintiff contends are fraudulent were revealed to the market" through the Lehman report. *See Metzler Inv.*, 540 F.3d at 1063. All that the Lehman Report "revealed to the market" on June 8, 2006, was a "highly questionable" option grant history by Apollo. Despite how plaintiff depicts it, that Report did not "explicitly alert[ ] the

market that Apollo had very likely engaged in backdating and thereby reveal that its prior statements which failed to disclose or account for such backdating may well have been false." Supp. Br. (doc. 101) at 10.

There is nothing in the Lehman Report even hinting that Apollo engaged in any of the three fraudulent activities which the FAC alleges. Indeed, there is no mention in the Lehman Report of Apollo's prior financial statements, let alone that they "were false and misleading because they failed to account for stock option expenses[.]" *See id.* (citations omitted). That Report is similarly silent regarding the allegedly false SOX certifications, and Apollo's purported false representations as to how it accounted for its stock-based awards. While the court is well aware that "a disclosure need not reflect every detail of the alleged fraud," nonetheless, it "must reveal some aspect of it." *See Omnicom*, 541 F.Supp.2d at 551. The Lehman Report does not make any such revelations. Succinctly put, no "truth of a misrepresentation about [Apollo's] stock was revealed[ ]" in the Lehman Report. *See Amkor*, 527 F.Supp.2d at 946 (citations omitted).

The weakness in plaintiff's reliance upon the Lehman Report to support loss causation becomes even more evident considering the relatively insignificant drop in the price of Apollo stock which followed that Report. As noted earlier, the FAC alleges a 2.7 percent drop in Apollo's stock price on June 8, 2006, the date the Lehman Report was issued. This allegation does not meet *Dura*'s requirement of an allegation "that the defendant's 'share price fell *significantly* after the truth became known.'" *See Metzler Inv.*, 540 F.3d at 1062 (quoting *Dura*, 544 U.S. at 347, 125 S.Ct. 1627) (emphasis added). Certainly if, as in *Metzler Inv.* "stock recover[y] very

shortly after the modest 10% drop that accompanied" the alleged corrective disclosure does not suffice to allege loss causation, the modest 2.7 percent drop alleged herein is not sufficient either. *See id.* at 1064 (footnote omitted). In sum, the Lehman Report is not a corrective disclosure which can, in turn, support a finding that plaintiff's loss causation allegations are sufficient.

### ii. Subpoena Disclosure

The next alleged "corrective disclosure" occurred on June 19, 2006. On that date, the FAC alleges, Apollo "disclosed that it received a subpoena from the U.S. Attorney for the Southern District of New York requesting documents relating to [its] stock option grants." FAC (doc. 71) at ¶ 92. The FAC further alleges that at that point, "Apollo again denied any impropriety, stating that '[its] board of directors has hired an outside firm to review and confirm the company's initial conclusions that the Company acted appropriately regarding its stock option practices.' " *Id.* Allegedly this "disclosure caused Apollo's stock price to drop 5.3% on the next trading day[.]' " *Id.*

Apollo contends that these allegations do not constitute a corrective disclosure because, as with the Lehman Report, they do not correct prior financial statements, or state a need for such a correction. Moreover, Apollo contends, the fact that a public company is subject to a "regulatory investigation[,]" or conducts its own internal review, does not amount to a corrective disclosure. Mot. (doc. 81) at 19. From plaintiff's standpoint, however, the significance of the allegations quoted above is that they "began to reveal the falsity of Apollo's prior statements or omissions, which is all that *Daou* and *Metzler Inv.* require." Supp. Br. (doc. 101) at 11 (internal quotation marks and citations omitted).

For several reasons, Apollo has the stronger argument. First, neither of these announcements disclose any wrongdoing by defendants. As in *Amkor*, Apollo's June 19th news release did "not signal, much less state, that any prior option grants were incorrect, that [the company's] internal controls were weak, that there was evidence supporting a finding [of] intentional[ ] manipulat[ion][of] stock option pricing or that prior financial statements were incorrect in any way." *Amkor*, 527 F.Supp.2d at 947.

Second, the court agrees with those courts finding that standing alone the announcement of an internal investigation does not give rise to a viable loss causation allegation. *See, e.g., Hansen, supra,* 527 F.Supp.2d at 1162 (internal quotation marks and citations omitted) ("[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing . . . on the part of [a] company or its senior management."). Plaintiff does not attempt to distinguish that line of cases, but instead directs the court's attention to *UTStarcom II, supra,* 2008 WL 4002855. As plaintiff reads that case, it stands for the proposition that "merely announc[ing] . . . an internal investigation [is] sufficient to allege loss causation." Supp. Br. (doc. 101) at 12 (citation omitted). That is too broad a reading of *UTStarcom II*, however. As will be discussed more fully below, it was not the "mere" announcement of an internal investigation upon which the court there based its finding that plaintiff had adequately pled loss causation. Rather, it was the content of that announcement and the message it sent to the market—content which is missing from Apollo's June 19th announcement.

In *Rudolph v. UTStarcom*, 560 F.Supp.2d 880 (N.D.Cal.2008) ("*UTStarcom I*"), the court held that a press release announcing an internal investigation into

the company's historical equity award grant practices did not sufficiently allege loss causation. Among other reasons, the court in *UTStarcom I* held that that announcement did not sufficiently plead loss causation because "prior to any revelation by defendants of actual backdating, the 'true nature of [the company's] financial condition had not yet been disclosed.' " *Id.* at 888 (quoting *Daou*, 411 F.3d at 1027). Upon reconsideration, however, applying *Gilead*'s plausibility standard, the court held that the announcement of an internal investigation "could plausibly establish loss causation." *UTStarcom II*, 2008 WL 4002855, at *4.

At first glance *UTStar II* might appear to compel the conclusion that Apollo's June 19th announcement sufficiently pleads loss causation. What plaintiff fails to consider though is the critical distinction between the language of the *UTStar* press release and that of Apollo's news release. Like Apollo's June 19th news release, the *UTStar* press release, "did not definitively state that backdating had occurred or that UTStarcom would adjust its prior financial statements as they related to equity grants[.]" *UTStarcom II*, 2008 WL 4002855, at *4. What the press release in *UTStarcom II* did accomplish, however, was, "for the first time, [to] put the market on notice that such disclosures *might be forthcoming.*" *Id.* (emphasis added). The *UTStarcom* press release foreshadowed the possibility that the Company would be correcting its prior financial statements, although that release "specifically stated that no conclusions have been reached about whether the Company would need to record any non-cash adjustments to its financial statements related to prior equity grants." *UTStarcom I*, 560 F.Supp.2d at 888 (internal quotation marks and citation omitted).

Apollo's June 19th news release does not contain any similar language. As will be discussed in detail momentarily, here, such a revelation did not occur until October 18, 2006. Given this significant distinction between the *UTStarcom* press release and Apollo's June 19th news release, plaintiff's reliance upon *UTStarcom II* is unavailing.

Further undermining plaintiff's reliance upon the June 19th news release to plead loss causation is the fact that that release explicitly states, "[a]s *previously* announced, Apollo . . . has hired an outside firm" to review its stock option practices. Farrell Decl'n (doc. 80), exh. 4 thereto at 6 (emphasis added). Therefore, even if the court agreed that that release revealed a fraud, it would not be a new fraud to which the market was purportedly reacting. It could not be a new fraud because that information had already been revealed to the public in a prior announcement. *Cf. Apollo Group, supra*, 2008 WL 3072731, at *3 (emphasis added) ("evidence . . . insufficient to show . . . any . . . aspect[ ]" of analyst's reports were corrective where they "did not provide any *new, fraud-revealing* analysis[ ]").

Having found that the June 19, 2006, news release is not a corrective disclosure which can form the basis for pleading loss causation, there is no need to address the parties' arguments as to whether the alleged 5.3% drop in the price of Apollo stock on June 20, 2006 is sufficient to support a loss causation allegation. In any event, it is highly doubtful that a 5.3 percent price drop, assuming it was sufficiently tethered to the June 19th disclosure, would satisfy *Dura*'s requirement that the "share price f[a]ll significantly after truth bec[o]me[s] known." *See Dura*, 544 U.S. at 347, 125 S.Ct. 1627. Thus, as with the Lehman Report, the June 19th press release cannot form the basis for pleading loss causation here.

### iii. News Release & Earnings Announcement

■ The third purported corrective disclosure is a "news release and disappointing earnings announcement" issued by Apollo on October 18, 2006. FAC (doc. 71) at ¶ 98. Plaintiff alleges that in those items Apollo "stated, for the first time, and in contrast to Apollo's previous denials, . . . *'various deficiencies in the process of granting and documenting stock options have been identified to date.* The accounting impact of these matters has not been quantified. *There can be no assurances that the results of the investigation will not require a possible restatement of the Company's financial statements* when the potential errors are quantified and assessed.' " *Id.* at ¶ 98 (emphasis added in FAC). Although the FAC does not allege it, the news release itself (of which the court has taken judicial notice), continues: "The attached unaudited financial statements do not include the impact of any unrecorded non-cash equity-based compensation charges that may be required at the conclusion of the review." Farrell Decl'n (doc. 80), exh. 6 thereto at 7. "Following this announcement," the FAC alleges that "Apollo's stock price dropped dramatically, falling 22.9% in one day to a 4–year low[.]" FAC (doc. 71) at ¶ 98.

Stressing that that news release merely indicates that "a restatement might be 'possible,' " Apollo asserts that this announcement is not a corrective disclosure which can form the basis for pleading loss causation. Mot. (doc. 81) at 19. Apollo further reasons that this disclosure is not corrective because it gives no indication of the number of stock option grants potentially affected by the identified deficiencies. As Apollo depicts it, this disclosure simply "identified options process 'deficiencies' with unknown accounting impact that may possibly necessitate an as-yet-unquan-

tified restatement." Supp. Memo. (doc. 102) at 3.

Apollo's attempts to minimize the significance of the October 18th news release is not persuasive. Surely if the press release in *UTStarcom* was sufficient to put the market on notice of the possibility of forthcoming restatements, the October 18th press release did the same. As discussed earlier, the press release in *UTStarcom* "specifically stated that no conclusions have been reached about whether the Company would need to record any non-cash adjustments to its financial statements related to prior equity grants." *UTStarcom I*, 560 F.Supp.2d at 888 (internal quotation marks and citation omitted). Yet, the court was willing to find that loss causation was sufficiently pled there because that disclosure "for the first time, put the market on notice that such disclosures might be forthcoming." *UTStarcom II*, 2008 WL 4002855, at *4.

Here, as the highlighted language quoted above shows, the October 18th release is cast in far more definite terms when it comes to suggesting the possibility of future restatements. What is more, that release explicitly "identified . . . various deficiencies" in Apollo's stock option grant processes. Farrell Decl'n (doc. 80), exh. 6 thereto at 7. Thus, plaintiff's theory that Apollo's stock price dropped in response to the October 18th announcement is "not facially implausible[.]" *See Gilead*, 536 F.3d at 1057. After *Gilead*, that is all the Ninth Circuit demands.

■ In addition, "[l]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *In re Take–Two Interactive Sec. Lit.*, 551 F.Supp.2d 247, 283 (S.D.N.Y.2008) (citation omitted). This significantly undercut's Apollo's assertion that the October 18th news release is not a corrective disclosure

because, essentially, it is too vague in terms of what it is revealing.

Apollo further argues that the October 18th news release cannot form the basis for allegations of loss causation because contemporaneously therewith Apollo made a "disappointing earnings announcement[.]" FAC (doc. 71) at ¶ 98. Apollo announced "fourth-quarter earnings fell 12 percent" because of enrollment issues. Farrell Decl'n (doc. 80), exh. 7 thereto at 2. Apollo also stated that it missed analysts' earnings expectations by 12 cents per share, or 18%. *Id.* Based upon the foregoing, Apollo contends that the stock drop is attributable to factors other than the announced identified deficiencies in its option grant process. Therefore, Apollo contends that the causal link between the announcement of a possible restatement and the stock price drop was effectively severed.

If the only announcement on October 18th had been a weak earnings statement, then perhaps Apollo would prevail on this argument. *See, e.g., In re Initial Public Offering Sec. Litig.*, 399 F.Supp.2d 261, 265–267 (S.D.N.Y.2005) (disclosures of failure to meet revenue forecasts and downward revisions of forecasts did not allege loss causation); and *In re First Union Corp. Sec. Litig.*, 2006 WL 163616 (W.D.N.C. Jan.20, 2006) (allegations that stock price decline was caused by two public revised earnings statements did not allege loss causation where no fraud revealed). In the present case, plaintiff alleges more than that, however. The allegations here of a "disappointing earnings announcement" coupled with the announcement of identified deficiencies in Apollo's option grant processes, along with raising the possibility of a restatement, are sufficient at the pleading stage. Whether the October 18th stock drop is attributable to some other cause, as Apollo maintains, is best left for another day. *See In re Openwave Systems Sec. Litig.*,

528 F.Supp.2d 236, 253 (S.D.N.Y.2007) (citation omitted).

Based upon the foregoing, the court finds plaintiff's allegations of loss causation are, as the Ninth Circuit requires, "not facially implausible" with respect to the October 18th announcement. *See Gilead,* 536 F.3d at 1057. For the reasons set forth above, however, the other two claimed corrective disclosures cannot form the basis for pleading loss causation.

Having ruled on defendants' motions insofar as they are directed at plaintiff's section 10(b) claims, the court will turn to plaintiff's remaining four causes of action.

### D. Insider Trading

Section 20A(a) of the Exchange Act creates a private cause of action for "contemporaneous" insider trading. *See* 15 U.S.C. § 78t–1(a) (West 1997). Pursuant to that statute, plaintiff is seeking to hold those "defendants that sold Apollo stock during the Class Period[,]" FAC at ¶ 184, meaning all of the defendants except Apollo and Mr. Mueller, liable for insider trading. The FAC alleges, "for example," that "Lead Plaintiff and members of the Class traded contemporaneously with defendants Blair, Bachus and Govenar by purchasing Apollo securities at artificially inflated prices on January 6–7, 2005 and suffered damages." FAC (doc. 71) at ¶ 186(a). As another "example," the FAC alleges that "Lead Plaintiff ... and members of the class" also "traded contemporaneously with defendants Bachus and Govenar ... on January 10–12, 2005[.]" *Id.* at ¶ 186(b). Apart from the individuals just named, the insider trading claim does not specifically mention any of the other individual defendants. Exhibit G to the FAC is a detailed list, however, of purported "insider sales" during the Class Period, listing every individual defendant except Brian Mueller, the dates of sale, shares sold, price and proceeds.

To state a cause of action under § 20A(a), "a plaintiff must plead ... a predicate violation of the securities laws," and "facts showing that the trading activity of plaintiffs and defendants occur[ed] 'contemporaneously[.]' " *In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d 1044, 1074 (C.D.Cal.2008) (quoting *Neubronner, supra* 6 F.3d at 670). The individual defendants assert that plaintiff has not plead either of those two elements; and hence the court should dismiss the § 20A(a) insider trading claim in its entirety.

Plaintiff has not, as the court previously found, adequately pled a violation of § 10(b) as to the following defendants— Bachus, DeConcini, Govenar, Noone, and John and Peter Sperling. Therefore, its § 20A(a) insider trading claim against those six defendants necessarily fails and the court grants their motion to dismiss in that regard. *See Johnson v. Aljian,* 490 F.3d 778, 781 (9th Cir.2007) (§ 20A claims require an independent violation of the Exchange Act).

Defendants Nelson, Gonzales, Blair and Norton stand on different footing that the defendants listed above, however, given the court's finding that the FAC adequately alleges § 10(b) claims as to them. Thus, the court must consider whether, nonetheless, these particular defendants are entitled to dismissal of the § 20A(a) claim for failure to plead contemporaneous trading. Contemporaneous trading is a "judicially-created standing requirement, specifying that to bring an insider trading claim, the plaintiff must have traded in a company's stock at about the same time as the alleged insider." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1001 (2002). The underlying purpose of that requirement is to ensure that "only parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims; those who did not trade contemporaneously could not have suffered a disadvantage from the insider's failure to disclose." *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 761 (N.D.Cal.1997).

Based upon *Neubronner,* Nelson, Norton and Gonzales contend that because the FAC does not "identify stock purchases [plaintiff] made contemporaneously with stock sales" by them, the court should dismiss the insider trading claim as against them. Plaintiff counters, in essence, that it is excused from that pleading requirement because "contemporaneous trading can encompass defendants' entire scheme." Resp. (doc. 94) at 53 (citation omitted). Defendants retort that this argument runs afoul of the Ninth Circuit's holding in *Neubronner.*

These arguments can easily be laid to rest. The "ultimate conclusion" in *Neubronner* was "that contemporaneous trading must be plead with particularity." *Brody,* 280 F.3d at 1001 (citing *Neubronner,* at 673). That particularity requirement encompasses allegations, at a minimum, of the dates upon which defendants sold their stock compared with the dates upon which plaintiff purchased stock. *See, e.g., In re Connetics Corp. Sec. Litig.,* 2008 WL 3842938, at *12 (N.D.Cal. Aug.14, 2008) (granting motion to dismiss § 20A claims where plaintiff did not allege the dates upon which certain defendants traded on insider information, and declining to find that allegations that one defendant's contemporaneous trading sufficed to show that other defendants also did); *Silicon Graphics,* 970 F.Supp. at 761 (dismissing with prejudice plaintiffs' insider trading claims against three defendants where plaintiffs did not allege that they traded contemporaneously with plaintiffs); and *Chan, supra,* 1998 WL 1018624, at *12, n. 10 (citations omitted) ("little basis" for insider trading claims where plaintiffs did

not allege "sufficient facts to establish that any of the Plaintiffs traded contemporaneously with the Defendants[ ]"). No such comparison can be made here. While exhibit G lists stock sales by ten of the 11 individual defendants, with the exception of the two allegations quoted at the beginning of this section, the FAC does not include similar details as to plaintiff. The lack of particularity as to plaintiff's trading history renders it impossible for the court to perform any meaningful analysis of the contemporaneous trading requirement, which at its core is a temporal requirement.

To illustrate, *In re Petco Animal Supplies Inc. Sec. Litig.*, 2005 WL 5957816 (S.D.Cal. Aug.1, 2005), by comparing that plaintiff's "certification of [its] stock trades," listing purchases with specific settlement dates, which was included as an exhibit to the complaint, with the SEC forms defendants provided listing their transaction dates, the court found that contemporaneous trading had been sufficiently alleged so as to state a claim for insider trading. *Id.* at *36–*37; *see also In re Countrywide Financial Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1205 (C.D.Cal.2008) (§ 20A claim sufficiently alleged based on "common stock transactions" as evidenced in exhibit to complaint "listing § 20A Defendants' sales next to contemporaneous [lead plaintiff's] purchases").

Plaintiff cites to *In re Am. Bus. Computers Corp. Sec. Litig.*, 1994 WL 848690 (S.D.N.Y. Feb.24, 1994) (Brieant, J.), as a basis for circumventing this contemporaneous trading requirement. The court there did adopt the "rule that a class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information." 1994 WL 848690, at *4. That rule

does not obviate the need, however, for plaintiff to allege in the first instance "the precise days when it purchased and sold [defendant's] stock," as is evidenced in *Middlesex*, 527 F.Supp.2d at 1196.

After weighing different approaches to the contemporaneous trading requirement, including a strict same day time frame, the *Middlesex* court decided to follow Judge Brieant's approach. Nevertheless, it granted plaintiff leave to amend its complaint "to add allegations related to its purchase of [defendant's] stock." *Id.* In particular, it directed plaintiff to "specif[y] the precise days when it purchased and sold [defendant's] stock" because neither the FAC nor the exhibits thereto included such information, although "another filing" before the court did. *Id.* That other filing showed that "Plaintiff traded on the same day as [one defendant], within eight days of [another], and within three days of [yet another]." *Id.*

Without deciding whether it will ultimately adopt Judge Brieant's rule, the court will follow the approach of the *Middlesex* court and allow plaintiff to amend its complaint so as to allege contemporaneous trading in the manner specified therein. Thus, the motion to dismiss the second claim as to defendants Nelson, Norton and Gonzales is denied on the condition that plaintiff amends its complaint to sufficiently allege contemporaneous trading as to these defendants. In the absence of such an amendment, the court will grant the motion by these three defendants to dismiss the § 20A(a) insider trading claim.

■ Defendant Blair's position differs from the three defendants just discussed because the FAC does allege that he traded contemporaneously with Lead Plaintiff on January 6–7, 2005. FAC (doc. 71) at ¶ 186(a).[16] Nevertheless, the court agrees

---

**16.** Exhibit G actually shows that defendant Blair sold Apollo stock on, among other days,

January 3, 2005, but not on January 6–7,

with defendant Blair that this insider trading claim is lacking as against him because plaintiff did not "plead facts to show that [Blair's] trading was out of proportion with [his] usual trading." *See Chan*, 1998 WL 1018624, at *12, n. 10 (citation omitted). Plaintiff makes the wholly unsupported assertion that because it has adequately alleged scienter, "there is no requirement in § 20 that an insider's sales . . . be out of line with prior trading history to allege a violation[ ]" of that statute. Resp. (doc. 94) at 53. The court adheres to its view previously expressed in *Chan* though, and on that basis finds that plaintiff has not sufficiently pled insider trading against defendant Blair.

The court will, however, allow plaintiff to amend its complaint insofar as it is attempting to allege insider trading against defendant Blair. Thus, as with defendants Nelson, Norton and Gonzales, Blair's motion to dismiss this insider trading claim is denied on the condition that plaintiff amends its complaint to sufficiently allege insider trading as to defendant Blair.

### E. *Control Person Liability*

 In its third claim, plaintiff alleges "control person" liability against all defendants pursuant to section 20(a) of the Exchange Act. In the Ninth Circuit, to "prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *America West, supra*, 320 F.3d at 945 (internal quotation marks and citation omitted). However, "to make out a prima facie case, it is not necessary to show actual participation or the exercise of power[,]" but "a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Id.* (internal quotation marks and citation omitted).

The individual defendants offer two alternative bases for dismissal of this section 20(a) claim. First, they state that because plaintiff has not pled an underlying violation of section 10(b), the control person claim necessarily fails as well. Second, the individual defendants contend that the FAC is deficient in that it does not sufficiently "plead facts showing that each [of them] controlled Apollo[.]" Mot. (doc. 82) at 25. These arguments are meritorious as to some, but not all, of the defendants.

 "There is no concrete test for establishing whether a defendant is a control person." *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D.Cal. Sept.24, 2001) (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir.1987)) ("[T]he concept of control, in the context of securities law, is an elusive notion for which no clear-cut rule or standard can be devised."). Accordingly, "[w]hether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *America West*, 320 F.3d at 945. The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Thus, among "the traditional indicia of control[ ]" are "owning stock in the target company, or having a seat on the board[.]" *America West*, 320 F.3d at 945 (internal quotation marks and citation

2005. The court assumes by his silence, and his failure to move for dismissal on the grounds that the January 3, 2005, sale date is not sufficiently close to plaintiff's alleged sale dates, that he concedes that the temporal proximity aspect of contemporaneous trading is met by these allegations.

omitted). By the same token, "an individual's status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control." *In re Amgen Inc. Sec. Litig.*, 544 F.Supp.2d 1009, 1037 (C.D.Cal.2008) (citing *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000)). Nevertheless, there is "persuasive authority indicat[ing] that an officer or director who has signed false financial statements containing materially false and misleading statements qualifies as a control person." *Id.* (collecting cases).

As previously discussed, plaintiff has not adequately pled a primary violation of section 10(b) as to defendants Bachus, DeConcini, Govenar, Mueller, Noone, and the Sperlings. Therefore, the court grants the motion by these defendants to dismiss the section 20(a) claims as against them. *See Zucco*, 552 F.3d at 990 (citations omitted) ("Section 20(a) claims may be dismissed summarily, ..., if a plaintiff fails to adequately plead a primary violation of section 10(b).")

However, assuming *arguendo* that upon amendment plaintiff can adequately allege a violation of § 10(b) against defendants Nelson, Norton, Gonzales and Blair, the court must address the second prong of § 20(a) liability—whether any of these individuals is a controlling person within the meaning of that statute. Examining the FAC in light of the principles set forth above readily shows that the control person allegations are sufficient as to defendants Nelson and Gonzales.[17] The FAC alleges not just their respective positions with Apollo—Nelson as former Chair, CEO and President and Gonzales as former CFO, Secretary and Treasurer—but it also describes their roles in Apollo's day-to-day operations, and more specifically

their involvement in the option grant and accounting processes. The FAC further alleges as to defendants Nelson and Gonzales that they signed false SOX certifications. The court thus concludes that the FAC adequately alleges control person liability under § 20(a) insofar as defendants Nelson and Gonzales are concerned. Accordingly it denies their motion to dismiss the § 20(a) claim as against them.

Although he was not an Apollo officer, the FAC sufficiently alleges control person liability as to defendant Blair, former Chairman of the Audit Committee and Compensation Committee member, and defendant Norton, Audit Committee member and Chairman of the Compensation Committee. The FAC delineates their duties and responsibilities in the respective Committee capacities. More specifically, the FAC alleges that as a member of the Audit Committee, Norton "was responsible for Apollo's public financial statements[,]" and as Compensation Committee Chairman, allegedly he "controlled the other defendants' backdated stock option awards." FAC at ¶ 23; *see also id.* at ¶¶ 39–40; and 115. Thus, the court denies defendant Nelson's motion to dismiss the § 20(a) claim as against him. *See Batwin*, 2008 WL 2676364, at *25 (denying motion to dismiss § 20(a) claim by two defendants who "controlled the Audit Committee" and as such "direct[ed] [the] defendant Company's policies relating to accounting and auditing during the Class Period[ ]").

The FAC includes similar allegations with respect to defendant Blair, thus warranting the same result—denying his motion to dismiss the section 20(a) claim. In particular, the FAC alleges that as Chairman of the Audit Committee, he "caused or allowed the dissemination of improper

---

**17.** Indeed perhaps these defendants concede as much in that individual defendants' motion focuses only upon the insufficiency of the

control person allegations as to defendants DeConcini, Govenar, Mueller and Noone. *See* Mot. (doc. 82) at 25.

public statements[.]" FAC (doc. 71) at ¶ 22. Moreover, "[a]s a member of the Compensation Committee, defendant Blair controlled the other defendants' backdated stock option awards." *Id.* As the FAC describes it, while serving on the Compensation Committee defendants Blair and Norton "were responsible for review[ing] all aspects of compensation of executive officers and determin[ing] or mak[ing] recommendations on such matters to the full [Apollo] Board ... [.]" *Id.* at ¶ 39 (internal quotation marks omitted); *see also id.* at ¶ 115 (enumerating "the role of the Compensation Committee ... in the backdating at Apollo, as well as the deficiencies in the conduct of th[at] ... Committee with respect to the options granting process[ ]").

To summarize, the court grants the motion to dismiss the section 20(a) control person liability claims as against defendants Bachus, DeConcini, Govenar, Mueller, Noone, and John and Peter Sperling. However, the court denies this aspect of the motion to dismiss by defendants Blair, Norton, Nelson, Gonzales and Apollo.

### F. State Law Claims

State law is the basis for plaintiff's remaining two claims. Plaintiff's fourth claim is for "breach of fiduciary duty and/or aiding and abetting" against all defendants. FAC at 94. Plaintiff's fifth and final claim is for "civil conspiracy to commit fraud[,]" but it is only against defendants Nelson, Blair, Norton, Bachus, Mueller, and Gonzales. *Id.* at 95.

As an initial matter, the individual defendants argue that the court should decline to exercise its supplemental jurisdiction over these remaining state law claims on the theory that plaintiff has failed to state a claim under federal law. The court's rulings herein undermine that argument however. Therefore, at this point in the litigation, the court will continue to

exercise its supplemental jurisdiction over these state law claims.

### 1. Securities Litigation Uniform Standards Act of 1998

Apollo's penultimate argument is that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") mandates dismissal of plaintiff's state law claims because they include "allegations of material misrepresentation and omission ... and incorporate the fraud claims asserted throughout the [FAC]." Mot. (doc. 81) at 29. Reasoning that "[b]ecause Apollo is an Arizona corporation ..., and plaintiff's state law claims are based on Arizona state law," plaintiff counters that those claims come within the purview of SLUSA's so-called Delaware carve-out. Resp. (doc. 94) at 55. In rejoinder, Apollo convincingly argues that plaintiff has not shown that its state law claims fit within either prong of that carve-out.

■ After the enactment of the PSLRA which, *inter alia*, heightened the pleading standards in federal securities cases, there was a "pilgrimage of securities claims to state courts, thus circumventing congressional reforms to restrict federal securities claims." *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1128 (9th Cir.2002) (citations omitted). To stem this tide, Congress enacted the SLUSA. *See Merrill Lynch v. Dabit*, 547 U.S. 71, 82, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). "With few exceptions, SLUSA limits the maintenance of certain class-action suits in either state or federal court[.]" *Huang v. Reyes*, 2008 WL 648519, at *2 (N.D.Cal. March 6, 2008) (citing 15 U.S.C. §§ 77p(c), 78 bb(f)(2)). If a court determines that SLUSA precludes an action or claim, dismissal is required. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644, 126 S.Ct. 2145, 2155, 165 L.Ed.2d 92 (2006) ("If the action is precluded [under SLUSA], nei-

ther the District Court nor the state court may entertain it, and the proper course is to dismiss.")

Under SLUSA, no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" may be "maintained in any State or Federal Court by any private party." 15 U.S.C. § 78bb(f)(1)(A). Because plaintiff is invoking the Delaware carve-out, presumably it concedes at the outset that its state law claims meet those criteria, and thus are governed by SLUSA in the first instance. In any event, as set forth below, undoubtedly that is the case.

■■■ "A 'covered class action' is a lawsuit in which damages are sought on behalf of more than 50 people[,]" such as the present action. *See Dabit*, 547 U.S. at 83, 126 S.Ct. at 1512 (footnote omitted). Further, "[t]he grant of an employee stock option on a covered security[,]" of the kind at issue herein, "is a 'sale' of that covered security for purposes of SLUSA preemption." *Falkowski*, 309 F.3d at 1129–30. Finally, in alleging state common law breach of fiduciary duty, plaintiff expressly alleges "material misrepresentations ... regarding defendants' option backdating scheme." FAC (doc. 71) at ¶ 194. Plaintiff similarly alleges that certain defendants engaged in a civil conspiracy to commit fraud by, *inter alia*, making false or misleading statements and/or omitting material facts regarding stock option grants at Apollo. As the foregoing shows, these state law claims fall within the category of claims which SLUSA precludes. The issue thus becomes whether, as plaintiff urges, it can avail itself of the Delaware carve-out exception to SLUSA's broad reach.

That carve-out "exempts class actions based on the statutory or common law of the security issuer's state of incorpo-

ration." *Huang*, 2008 WL 648519, at *2 (citations omitted). This exception "preserves class actions based on the law of the security issuer's state of incorporation when certain criteria are met." *Crimi v. Barnholt*, 2008 WL 4287566, at *2 (N.D.Cal. Sept.17, 2008) (citation omitted). The action must involve either:

(i) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

(ii) any recommendation, position, or other communication with respect to the sale of securities of the issuer that—

(I) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

(II) concerns decisions of those equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

15 U.S.C. §§ 77p(d)(1), 78bb(f)(3)(A) (West Supp.2008). A case falling into either prong of this carve-out "may be maintained in a State or Federal court[.]" 15 U.S.C. §§ 77p(d)(1)(A), 78bb(f)(3)(A)(i) (West Supp.2008).

As Apollo correctly points out, plaintiff made no attempt to satisfy either of those two prongs. It is readily apparent that plaintiff's state law claims do not meet the criteria of the first prong. Apparently plaintiff is attempting to rely upon the second prong because it cites to *Indiana Elec. Workers Pension Trust Fund v. Millard*, 2007 WL 2141697 (S.D.N.Y. July 25, 2007), where the court did hold that that prong precluded removal. *Millard* is readily distinguishable, though, in that it included allegations "that the defendants misrepresented the way the strike prices for L–3's stock options were calculated in proxy statements sent to shareholders ...

and that th[o]se misstatements led the shareholders to authorize the Board to dedicate 6.5 million additional shares to the stock option plan." *Id.* at *4. The *Millard* court found that those allegations "relate[d] to communications concerning a shareholder vote[,]" thus satisfying the " 'voting their security' element of prong (II)." *Id.* at *8.

■ Here, the FAC does not include any such similar allegations pertaining to Apollo's proxy statements. Accordingly, because plaintiff's fourth and fifth claims based upon state law fall within the ambit of SLUSA, and because these claims are not exempt under the Delaware carve-out to that Act, the court grants defendants' motion to dismiss these state law claims as precluded by SLUSA. Having found that SLUSA clearly bars plaintiff's state law claims, there is no need to address defendants' other proffered reasons for dismissing these state law claims.

### III. Leave to Amend

If the court grants all or, as it has, any part of defendants' motions to dismiss, plaintiff specifically requests leave to amend its FAC to "address any concerns" which the court "identifie[s][.]" Resp. (doc. 94) at 56. In seeking leave to amend, plaintiff stresses that where, as here, a responsive pleading has not yet been filed, a plaintiff "may amend its pleading once as a matter of course[.]" Fed.R.Civ.P. 15(a)(1).

Apollo alone is taking the position that the court should not allow plaintiff to amend because this is the second amended complaint and "Lead Counsel had more than one year from the end of the proposed class period until the [FAC] was filed to conduct an investigation[.]" Reply (doc. 97) at 14. "More importantly," from Apollo's standpoint, is that granting leave to amend would not alter the statute of repose; the preclusive effects of the SLU-SA and plaintiff's failure to adequately plead loss causation. *Id.* Apollo's position is well taken as to the first two issues, but not as to the third—loss causation—given the court's finding that plaintiff has sufficiently pled that element.

It is beyond cavil that leave to amend "should [be] freely give[n] when justice so requires." Fed.R.Civ.P. 15(a)(2). According to the Ninth Circuit, "[t]his policy is to be applied with extreme liberality." *Eminence Capital, supra,* 316 F.3d at 1052(internal quotation marks and citations omitted). In the seminal case of *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court specified the following factors which a district court should consider in deciding whether to grant leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave should, as the rules require, be 'freely given.'

*Id.* at 182, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222.

■ "Not all of these factors merit equal weight[ ]" in a court's analysis, however. *Eminence Capital,* 316 F.3d at 1052. "[C]onsideration of prejudice to the opposing party . . . carries the greatest weight." *Id.* (citation omitted). Moreover, "[a]bsent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* (emphasis in original) (citation omitted). In a similar vein, the Ninth Circuit has stated that "[a]dherence to these" relatively liberal amendment "principles is especially important in the context

of the PSLRA." *Id.* The Ninth Circuit further cautioned that "we are not operating the world of notice pleadings." *Id.* Rather, "[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." *Id.*

Preliminarily, the court notes that defendants are not claiming any prejudice here, and the court can conceive of none. There also has been no suggestion of bad faith and, again, the court conceives of none. Likewise, defendants do not contend that amendment would be futile. As in *Cornerstone, supra,* the court finds that "[a]mendment may not be futile in this case, as plaintiff's [FAC] contains many of the factual allegations required to plead securities liability against [Apollo] and [some of] the individual defendants." *Cornerstone,* 355 F.Supp.2d at 1094.

The pleading deficiencies here do not lay "in the raw content of" the FAC, "but in the absence of rigorously particularized allegations in accordance with the PSLRA." *See id.* "While this court regrets the accordingly painstaking effort that was required by this court and [to some extent] by defendants to interpret [the FAC], leave to amend will be granted[ ]" in accordance with the court's rulings herein and as set forth below. *See id.* Plaintiff is advised, however, that failure to cure the pleading deficiencies identified herein, and failure to comply with the relevant case law in that regard, may well lead to dismissal of these claims in the future.

### IV. Rule 54(b) Certification

Pursuant to Fed.R.Civ.P. 54(b), a district court may direct entry of final judgment, *inter alia,* "[w]hen an action presents more than one claim for relief ... or when multiple parties are involved." Fed. R.Civ.P. 54(b). In deciding whether entry of final judgment under that Rule is appropriate, the court "must first determine that

it has rendered a 'final judgment[.]' " *Wood v. GCC Bend, LLC,* 422 F.3d 873, 878 (9th Cir.2005). That means a decision that is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) (internal quotation marks and citation omitted). Here, the court has rendered a final disposition as to plaintiff's claims against Messrs. Bachus, Mueller and DeConcini, and Ms. Govenar and Ms. Noone by granting their respective motions to dismiss all claims against them.

Next, as Rule 54(b) requires, the court must "expressly determine[ ] that there is no just reason for delay." Fed.R.Civ.P. 54(b). "It is left to the sound judicial discretion of the district court to determine the 'appropriate' time when each final decision in a multiple claim action is ready for appeal." *Id.* at 8, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1. "This discretion is to be exercised in the interest of sound judicial administration." *Id.* (internal quotation marks and citation omitted).

Whether there is "no just reason for delay" involves a two-step inquiry— "judicial concerns and equitable concerns". *See Gregorian v. Izvestia,* 871 F.2d 1515, 1519 (9th Cir.1989). Succinctly put, "judicial concerns" involve evaluating "the interrelationship of claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units." *Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. 1460, 64 L.Ed.2d 1. "A judgment should not be certified ... under Rule 54(b) when 'the facts on all claims and issues *entirely overlap* and successive appeals are essentially inevitable.' " *Robinson v. De la Vega,* 2008 WL 4748171, at *2 (S.D.Cal. Oct.24, 2008) (quoting *Wood,* 422 F.3d at 883) (emphasis added). "Thus, the trial court must consider whether: 1) certification would result

in unnecessary appellate review; 2) the claims finally adjudicated were separate, distinct, and independent of any other claims; 3) review of the adjudicated claims would be mooted by any future developments in the case; and 4) an appellate court would have to decide the same issue more than once even if there were subsequent appeals." *Id.* (citing *Wood,* 422 F.3d at 879).

There is some commonality among the claims against the remaining defendants and the adjudicated claims of the defendants listed above. On balance, however, and focusing upon "severability and efficient judicial administration[,]" *Wood,* 422 F.3d at 880, the court finds that the dismissed claims are "sufficiently separate and distinct" from plaintiff's remaining claims so as to warrant entry of final judgment as to defendants Bachus; Govenar; Mueller; DeConcini; and Noone. *See Ahmadi v. Chertoff,* 2008 WL 1886001, at *6 (N.D.Cal. April 25, 2008). Moreover, the facts on all claims and issues certainly do not "entirely overlap." Given that the claims of the just listed defendants are easily severable from those of the remaining defendants, the court finds that in the interest of efficient judicial administration, judgment under Rule 54(b) is appropriate here.

Assessing the equities, the court sees no just reason for delaying an appeal as to the defendants listed in the preceding paragraph. Given the already protracted nature of this action, prejudice would result to those defendants if they were forced to await the final resolution of this action. Moreover, the court cannot ignore the fact that litigation of this kind is costly, both from a monetary and an emotional standpoint. Given those costs and the resultant prejudice, the equities weigh heavily in favor of allowing defendants Bachus, Govenar, Mueller, DeConcini, and Noone, to have finality sooner rather than later.

Thus, the court finds that judgment should be entered as to the above named defendants as Rule 54(b) allows.

## Conclusion

For the reasons set forth above, IT IS ORDERED that the motion to dismiss by defendant Apollo Group, Inc. (doc. 81) and the individual defendants (doc. 82) is GRANTED in part and DENIED in part:

(1) defendants' motions are GRANTED to the extent plaintiff's claims are based on statements outside the statute of repose (*i.e.,* prior to November 2, 2001);

(2) defendants motions are GRANTED on statute of limitations grounds to the extent plaintiff is alleging stock option backdating for grants on December 18, 1998; April 19, 1999; January 12, 2000; December 15, 2000; and September 21, 2001;

(3) GRANTS with prejudice the motion to dismiss the § 10(b) and Rule 10b–5 claim against defendants Daniel E. Bachus; Dino J. DeConcini; Hedy Govenar; Brian E. Mueller; and Laura Noone;

(4) GRANTS without prejudice the motion to dismiss the § 10(b) and Rule 10b–5 claim against defendants John G. Sperling and Peter Sperling;

(5) DENIES the motion to dismiss the § 10(b) and Rule 10b–5 claims against defendants Todd S. Nelson; Kenda B. Gonzales; John R. Norton III; John Blair; and the Apollo Group, Inc.;

(6) GRANTS with prejudice the motion to dismiss the § 20A(a)insider trading claim against defendants Daniel E. Bachus; Dino J. DeConcini; Hedy Govenar; and Laura Noone;

(7) GRANTS without prejudice the motion to dismiss the § 20A(a) insider trading claim against defendants John G. Sperling and Peter Sperling;

(8) DENIES the motion to dismiss the § 20A(a) insider trading claim against defendant Todd S. Nelson; Kenda B. Gonzales; John R. Norton III; and John Blair;

(9) GRANTS with prejudice the motion to dismiss the § 20a control person liability claims against defendants Daniel E. Bachus; Dino J. DeConcini; Hedy Govenar; Brian E. Mueller; and Laura Noone;

(10) GRANTS without prejudice the motion to dismiss the § 20a control person liability claim against defendants John G. Sperling and Peter Sperling;

(11) DENIES the motion to dismiss the § 20a control person liability claim against defendants Todd S. Nelson, Kenda B. Gonzales; John R. Norton III; John Blair; and the Apollo Group, Inc.;

(12) GRANTS with prejudice defendants' motion to dismiss the state law claim "For Breach of Fiduciary Duty and/or Aiding and Abetting[;]"

(13) GRANTS with prejudice the motion to dismiss the state law claims for "Civil Conspiracy to Commit Fraud" by defendants Todd S. Nelson; John Blair; John R. Norton III; Kenda B. Gonzales; Daniel E. Bachus; and Brian E. Mueller;

(14) GRANTS plaintiff's "request" for leave, if it so desires, to further amend its complaint and to file a second amended complaint within thirty (30) days of the entry of this order as to defendants Apollo Group, Inc.; John G. Sperling; Todd S. Nelson; Kenda B. Gonzales; John Blair; John R. Norton III; and Peter Sperling; and

IT IS FURTHER ORDERED that pursuant to Fed.R.Civ.P. 54(b), the Clerk of the Court is hereby directed to enter judgment in favor of defendants Daniel E. Ba-

chus; Hedy Govenar; Brian E. Mueller; Dino J. DeConcini; and Laura Noone.